79 P.3d 432 (2003)
STATE of Washington, Respondent,
v.
Paramjit Singh DHALIWAL, Petitioner.
No. 73220-5.
Supreme Court of Washington, En Banc.
Argued May 15, 2003.
Decided November 20, 2003.
*434 Cassandra Stamm, Richard Alan Hansen, Allen Hansen & Maybrown PS, Seattle, for Petitioner.
Norm Maleng, King County Prosecutor, Lee Yates, Deputy, Seattle, for Respondent.
*433 BRIDGE, J.
On December 28, 1999, Paramjit Singh Dhaliwal shot fellow Farwest Cab Company (Farwest) taxi driver and Sikh, Jasbir Bassi, at an intersection in downtown Seattle. Bassi died from the wound two days later. Dhaliwal was charged with murder in the first degree and carrying a concealed handgun. The jury found him guilty on both counts, with a special verdict that he was armed with a firearm. At trial, Dhaliwal was represented by Antonio Salazar, who was also simultaneously representing several of the State and defense witnesses in civil litigation involving Farwest. He had also previously represented two of the witnesses on an assault charge in which Dhaliwal had been a codefendant. Dhaliwal contends that his Sixth Amendment right to a conflict-free attorney was violated because of Salazar's concurrent and previous representation of these witnesses. He also claims that the State committed prosecutorial misconduct by making prejudicial statements about the Sikh community and religion in its closing argument. Division One of the Court of Appeals found Dhaliwal's arguments to be without merit. We affirm.

I
Dhaliwal and Bassi, both Sikhs, owned and drove Farwest taxicabs in the Seattle area. At the time of the shooting, Dhaliwal was a member of Farwest's grievance committee and was a supporter of the current 1999 board of directors. The 1999 board had instituted some controversial changes, which caused serious unrest and disagreement among the cab drivers, who were split into two factions. Bassi was a member of the opposing faction, which supported the former 1998 board.
On the morning of the shooting, Dhaliwal assaulted Ranjit Kandola, a member of the opposing faction. Later that same day, Bassi, Kandola, and several other members of the opposing faction gathered to discuss the confrontation. They concluded that they should go to the Farwest parking lot to discuss the problems between the two factions with members of the Farwest board and the Sikh temple.[1] Bassi and four others borrowed a white Honda and two others followed in a taxicab.[2]
While on Interstate 5, those in the white Honda spotted Dhaliwal's cab heading toward downtown. They followed him to the Westin Hotel, where Dhaliwal dropped off his fare. Meanwhile, Dhaliwal realized he was being followed and telephoned several of his friends, including Gurinder Grewal. Grewal was waiting at the Westin in his cab when Dhaliwal and Bassi's group arrived.
After leaving the Westin, Dhaliwal was forced to stop for a red light. Bassi's car stopped behind him and Bassi got out of the car and approached Dhaliwal's cab. Some of the eye witnesses reported that Bassi was screaming, waving his arms, and pounding his fists on the top of Dhaliwal's cab. From the window of his cab Dhaliwal fired his gun at Bassi, who was unarmed. Bassi returned *435 to the Honda, stating "`I've been shot. He shot me. Call 911. Call the police.'" State v. Dhaliwal, 113 Wash.App. 226, 230, 53 P.3d 65 (2002). Dhaliwal stepped out of his cab, firing several more shots in the direction of Bassi and the Honda. Bassi died from his wounds two days later.
Dhaliwal fled the scene in his cab, abandoning it near Garfield High School. Grewal also fled the scene, but was detained by police shortly thereafter. He gave the police a statement in which he claimed that Dhaliwal had received death threats and that the men in the cars following Dhaliwal had been armed.
Dhaliwal remained at large for several months before turning himself in. After being released on bail, he resided with Grewal. Their friendship dissolved, however, when Grewal was told that Dhaliwal was involved in distributing a letter reporting the alleged infidelity of Grewal's wife. At trial, Grewal testified for the State, recanting the statement he gave to police on the day of the shooting.[3]
The State charged Dhaliwal with murder in the first degree and carrying a concealed weapon. Dhaliwal claimed that he acted in self-defense because he feared for his life when confronted by Bassi. The jury found him guilty on both counts. Dhaliwal was sentenced to 300 months in prison, a standard range sentence.
Dhaliwal appealed to Division One of the Court of Appeals. He claimed that his Sixth Amendment right to an attorney free from conflicts of interest was violated because his trial attorney, Antonio Salazar, simultaneously and previously represented several of the witnesses at trial. At the time of Dhaliwal's trial, Salazar was also representing Gurcharan Saidpur, Resham Singh, Harbhajan Sidhu, and Surinder Sohal in a shareholder action against Farwest that contested their termination by the 2000 board of directors.[4] Saidpur and Singh testified for the defense at Dhaliwal's trial while Sohal testified for the State. Salazar had also previously represented Grewal and Harbhajan Singh on an assault charge in which Dhaliwal was a codefendant. At Dhaliwal's murder trial, Grewal testified for the State and Singh testified for the defense.
Prior to Dhaliwal's trial, the prosecutor brought the potential conflict of interest to the court's attention outside of the jury's presence. The trial judge asked Salazar about his representation of the witnesses and accepted Salazar's assessment that there was no conflict. After briefly advising Dhaliwal about the need to be aware of the possibility of conflicts of interest, the court accepted Dhaliwal's statement that he wanted Salazar to continue representing him.[5] At no point during his trial did Dhaliwal object to Salazar representing him.
The Court of Appeals found that the trial court had failed to conduct a sufficient inquiry into Salazar's conflicts of interest, but that *436 Dhaliwal was not entitled to a new trial. Dhaliwal, 113 Wash.App. at 234, 53 P.3d 65. Relying on Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002), the Court of Appeals held that reversal was not warranted unless Dhaliwal could demonstrate that his lawyer had an actual conflict of interest and that the lawyer's performance at trial was adversely affected by that conflict. Dhaliwal, 113 Wash.App. at 237, 53 P.3d 65. Finding that Dhaliwal failed to show both an actual conflict and a negative effect on performance, the Court of Appeals affirmed the superior court.
Dhaliwal also argued on appeal that the prosecutor made improper remarks about the Sikh community during his closing argument. Although Dhaliwal asserted that the prosecutor made comments suggesting that Sikhs are prone to violence, the Court of Appeals found the comments to be within the permissible scope of final argument and that any impropriety could have been cured by an instruction to the jury had Dhaliwal objected at trial. Id. at 242, 53 P.3d 65.
Dhaliwal filed a motion for reconsideration, which the Court of Appeals denied on October 10, 2002. He then filed a petition for review with this court, which was granted. We now affirm the Court of Appeals.

II

Sixth Amendment Right to an Attorney Free from Conflict
The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." U.S. Const. amend. VI. This right includes the right to the assistance of an attorney who is free from any conflict of interest in the case. Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); State v. Davis, 141 Wash.2d 798, 860, 10 P.3d 977 (2000).
Dhaliwal argues that Salazar had a conflict of interest because he also represented some of the witnesses at Dhaliwal's trial in other matters. Dhaliwal asserts that some of these witnesses had interests adverse to his and that Salazar's performance was negatively affected by these conflicts of interest. The State, on the other hand, maintains that Dhaliwal has not shown that his attorney represented actual conflicting interests or that any such conflict adversely affected Salazar's performance.
First, the State asserts that Dhaliwal waived his right to a conflict-free attorney. Even if an attorney has a conflict of interest, he or she may continue to represent the defendant if the defendant makes a voluntary, knowing, and intelligent waiver. See Holloway v. Arkansas, 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Because both Dhaliwal and the trial court were aware of Salazar's representation of various witnesses, the State claims that the discussion between Salazar, the court, and Dhaliwal about the potential conflict constituted a waiver of Dhaliwal's right to choose an attorney free from conflict.
In Garcia v. Bunnell, 33 F.3d 1193, 1194 (9th Cir.1994), the defendant's attorney advised him several hours before the trial began that he had accepted a position with the prosecution to begin after the trial was over. The Ninth Circuit held that the defendant had effectively waived his right to a conflict-free attorney because his comments on the record indicated his understanding of the situation.[6]Id. at 1195-96. Furthermore, the trial court granted a five-day continuance so that the defendant could think about and discuss with other people whether he wanted to continue with his current attorney despite the conflict. Id. at 1196. By nonetheless electing to continue with his attorney, Garcia "knowingly, intelligently, and voluntarily waived any rights even potentially implicated" by his attorney's employment decision. Id. at 1197.
*437 Here, the Court of Appeals determined that although the trial court and Dhaliwal were aware of the potential conflict of interest, Dhaliwal's responses did not constitute a waiver because the nature and extent of the conflict was not fully explored by the trial court. Dhaliwal, 113 Wash.App. at 232, 53 P.3d 65. Nor did the trial court inform Dhaliwal of the consequences of his choice of attorney. Id. at 234, 53 P.3d 65. In contrast to the defendant in Garcia, Dhaliwal's answers to the court's inquiry into his understanding of the situation were limited to simple affirmatives. See supra, note 5. We agree that the trial court's inquiry was inadequate in these circumstances and hold that Dhaliwal did not waive his right to a conflict-free attorney.
In the Court of Appeals, Dhaliwal argued that the trial court's failure to inquire adequately into Salazar's potential conflict of interest required reversal. However, because of the United States Supreme Court's recent decision in Mickens, the Court of Appeals held that Dhaliwal was not automatically entitled to reversal based on the court's failure to inquire fully into the possible conflict. Dhaliwal, 113 Wash.App. at 237, 53 P.3d 65. Dhaliwal maintains that even after Mickens he is still entitled to a new trial because Salazar was operating under an actual conflict that adversely affected his performance.
In In re Personal Restraint of Richardson, 100 Wash.2d 669, 675 P.2d 209 (1983), this court reviewed a factually similar case in which the trial court failed to inquire about a conflict of interest despite being aware that the defendant's lawyer had previously represented one of the witnesses in the case. There, this court held that if a trial court knows or should know of a conflict of interest but fails to inquire, it has committed reversible error. Id. at 677, 675 P.2d 209. Reversal is also mandated if the defendant shows an "actual conflict of interest adversely affecting his lawyer's performance." Id. In neither case is the defendant required to demonstrate prejudice. Id.
The holding in Richardson was based on three United States Supreme Court cases: Holloway, 435 U.S. 475, 98 S.Ct. 1173, Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and Wood, 450 U.S. 261, 101 S.Ct. 1097. In Holloway, one attorney was appointed to represent three codefendants on rape and robbery charges. 435 U.S. at 477, 98 S.Ct. 1173. The attorney objected several times during the proceedings, stating that he could not adequately represent all of the defendants because he had received confidential information from each of them and consequently was operating under a conflict of interest. Id. at 477-79, 98 S.Ct. 1173. However, the trial court refused to appoint separate counsel. Id. The Supreme Court held that the defendants' rights to assistance of counsel were violated when the trial court failed to appoint separate counsel or investigate the possible conflict of interest once it had been brought to the court's attention. Id. at 484, 98 S.Ct. 1173.
In Sullivan, two attorneys represented three defendants at their separate trials for two murders. 446 U.S. at 337-38, 100 S.Ct. 1708. The attorneys did not object to the multiple representation at trial, nor did Sullivan. Id. The Sullivan Court held that the trial court was under no duty to inquire about a possible conflict of interest simply due to the fact of the multiple representation, stating: "Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." Id. at 347, 100 S.Ct. 1708. Because the defendant had not objected to the representation at trial, he had to demonstrate that there was an actual conflict that adversely affected his attorney's performance. Id. at 348, 100 S.Ct. 1708.
In Wood, the defendants, who were employees of an adult theatre and bookstore, were charged with distributing obscene material. 450 U.S. at 263, 101 S.Ct. 1097. Their employer retained a lawyer for them and promised to pay any fines imposed. Id. at 266, 101 S.Ct. 1097. Although it was not possible to ascertain whether the attorney's performance was influenced by the interests of the employer, the Court nevertheless held that "the possibility of a conflict of interest was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further." Id. at 272, 101
*438 S.Ct. 1097. Citing Sullivan, the Court found reversal to be mandatory when the trial court has failed to inquire about a conflict despite the fact that it knew or reasonably should have known about the existence of a conflict. Id. at 273 n. 18, 101 S.Ct. 1097.
The Court of Appeals below found that the most recent United States Supreme Court opinion on this issue, Mickens v. Taylor, changed the rule adopted by this court in Richardson. Dhaliwal, 113 Wash.App. at 235-36, 53 P.3d 65. In Mickens, the Supreme Court held that automatic reversal is not constitutionally required when a trial court fails to inquire about a potential conflict of which it was or should have been aware. 535 U.S. at 172, 122 S.Ct. 1237. Rather, to show a violation of the Sixth Amendment right to counsel free from conflict, the defendant must always demonstrate that his or her attorney had a conflict of interest that adversely affected his or her performance. Id. at 174, 122 S.Ct. 1237. "`[A]n actual conflict of interest' [means] precisely a conflict that affected counsel's performanceas opposed to a mere theoretical division of loyalties."[7]Id. at 171, 122 S.Ct. 1237.
The Court of Appeals below refused to reverse the trial court's decision because Dhaliwal had not shown an actual conflict or an adverse effect on his attorney's performance. Dhaliwal, 113 Wash.App. at 234, 53 P.3d 65. Applying Mickens, the court eliminated the first portion of the Richardson rule, which required reversal if the trial court simply knew or should have known of a possible conflict yet failed to inquire. The court then reformulated the test for determining whether the defendant's Sixth Amendment right was violated due to a conflict of interest. Id. at 237-38, 53 P.3d 65. First, the defendant must show an actual conflict by citing portions of the record that demonstrate "the attorney was caught in a `struggle to serve two masters.'" Id. (quoting Glasser v. United States, 315 U.S. 60, 75, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). Second, the defendant must show that the conflict of interest adversely affected the attorney's performance in some way. Id. at 238, 53 P.3d 65. Thus, "[t]he conflict `must cause some lapse in representation contrary to the defendant's interests,' or have likely affected counsel's conduct of particular aspects of the trial or counsel's advocacy on behalf of the defendant." Id. (footnote omitted) (quoting Sullivan v. Cuyler, 723 F.2d 1077, 1086 (3d Cir.1983)).
We agree that under Mickens reversal is not mandated when a trial court knows of a potential conflict but fails to inquire. However, we disagree with the Court of Appeals' reformulation of the Mickens actual conflict rule. In Mickens, the Court stated: "[T]he Sullivan standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An `actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." 535 U.S. at 172 n. 5, 122 S.Ct. 1237. The Court of Appeals, however, formulated a two-prong test consisting of actual conflict and adverse effect. Consistent with Mickens, we hold that a defendant asserting a conflict of interest on the part of his or her counsel need only show that a conflict adversely affected the attorney's performance to show a violation of his or her Sixth Amendment right.
Dhaliwal argues that Salazar's performance was negatively affected because he was unable to effectively challenge Grewal's testimony about the previous assault case due to his representation of Grewal in that matter. It is Dhaliwal's contention that testimony about the assault was of critical importance in the murder case against Dhaliwal because the State used it to show that Dhaliwal had threatened witnesses and contrived testimony in the past. Dhaliwal's trial attorneys questioned Grewal extensively at trial, subjecting him to cross-examination spanning more than 70 pages in the record. His cross-examination included questions about the prior assault case. When questioned by Salazar's cocounsel, Mr. Cobos, Grewal stated:
*439 "Your office represented me, Harbhajan Singh and Paramjit Dhaliwal, you know better than I can describe." 02/05/01 Report of Proceedings (RP) at 89-90. Yet Cobos continued to question Grewal about this incident, thus indicating no reluctance on his part to interrogate his cocounsel's former client about the prior case.[8] It was only after the State's objection that Cobos' questioning of Grewal on this issue was brought to an end.
Although not discussed by the Court of Appeals, several of the other witnesses at trial, Gurcharan Saidpur, Resham Singh, and Surinder Sohal, were concurrently represented by Salazar in a shareholder action against Farwest. Saidpur and Singh testified for the defense, while Sohal testified for the State. The record indicates that this shareholder action was brought by several cab drivers who were terminated by Farwest, possibly as a result of the internal conflict between the two factions. As the State noted when Salazar's possible conflict was brought to the attention of the trial court, the shareholder action may be related to Dhaliwal's murder trial in that the terminations may have been in retaliation for Dhaliwal's shooting of Bassi.
Dhaliwal argues that Salazar's performance was affected by his dual representation of Dhaliwal and Sohal because Salazar failed to object to various hearsay statements and testimony about Dhaliwal's prior bad acts during Sohal's testimony. Standing alone, the failure to object to testimony does not indicate that Salazar was operating under a conflict, as there are numerous tactical reasons for not objecting to testimony. In ineffective assistance of counsel cases, this court has been reluctant to find counsel's performance deficient solely on the basis of questionable trial tactics. Richardson, 100 Wash.2d at 675, 675 P.2d 209.[9] In Sullivan, the United States Supreme Court found that the trial attorney's tactical decision to rest Sullivan's defense was a reasonable response to the weakness of the prosecutor's case rather than evidence of a conflict of interest. 446 U.S. at 347-48, 100 S.Ct. 1708. Similarly, Salazar's failure to object to testimony is a tactical decision that, without more, does not indicate that he was acting under a conflict of interest. This is not a case where the defendant's attorney utterly failed to make any objections, to cross examine the State's witnesses, or to mount a defense.[10]
Under Mickens and Sullivan, the defendant bears the burden of proving that there was an actual conflict that adversely affected his or her lawyer's performance. Mickens, 535 U.S. at 174, 122 S.Ct. 1237; Sullivan, 446 U.S. at 350, 100 S.Ct. 1708. Holding that the possibility of a conflict was not enough to warrant reversal of a conviction, the Sullivan Court stated: "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Id. at 350, 100 S.Ct. 1708. Here, Dhaliwal has demonstrated the possibility that his attorney was representing conflicting interests. However, he has failed to establish an actual *440 conflict because he has not shown how Salazar's concurrent representation of the witnesses involved in the shareholder action and his prior representation of Grewal affected Salazar's performance at trial.
As an alternative to reversal for a new trial, Dhaliwal urges that this case should be remanded for further inquiry into the nature and effects of Salazar's various conflicts. The Court of Appeals was unpersuaded by this argument because it found that Dhaliwal had shown neither a conflict of interest nor adverse consequences. Dhaliwal, 113 Wash. App. at 240, 53 P.3d 65. We likewise find insufficient evidence of an actual conflict to justify remand.
In Wood, the Supreme Court remanded so that the trial court could determine whether a conflict of interest, strongly suggested by the record, was an actual conflict at the time of trial. 450 U.S. at 273-74, 101 S.Ct. 1097. The defendants, who were charged with distributing obscene materials, were employees of an adult theater and bookstore. Id. at 263, 101 S.Ct. 1097. Their employer paid for their attorney and originally agreed to pay their fines as well. Id. at 266, 101 S.Ct. 1097. The defendants received $5,000 and $10,000 fines and jail sentences of 12 months, but were given immediate probation. Id. at 263-64, 101 S.Ct. 1097. Later, their probations were revoked when their employer failed to provide the money to pay their fines. Id. at 267, 101 S.Ct. 1097. The Supreme Court granted certiorari to decide whether it was constitutional for probationers to be imprisoned solely due to their inability to pay their fines. Id. at 264, 101 S.Ct. 1097. Rather than addressing this issue, the Court instead found that there was evidence that the employer was using its employees' situation as a test case. If the defendants could not be jailed for failure to pay, then the employer need not pay the fines imposed on its employees for distributing obscene materials. Id. at 267, 101 S.Ct. 1097. Because of the competing interests of the employees and their employer and because the employees' lawyer was retained on their behalf by the employer, "there [was] a clear possibility of conflict of interest...." Id. There was also compelling evidence that the attorney's performance was affected, as he did not object to the size of the fines imposed or attempt to modify the amount of the fines once the defendants' probations were in danger of being revoked. Id. at 267-68, 101 S.Ct. 1097.
Here, in contrast, Dhaliwal has failed to demonstrate the strong possibility that a conflict of interest had an effect on Salazar's performance. Further, unlike in Wood, Dhaliwal has already put forth his arguments for the alleged negative effects on Salazar's performance. As the issue was not briefed in Wood, it made sense for the Court to remand for further findings. There is no basis for remand here. Dhaliwal has had ample opportunity to prove that Salazar was operating under an actual conflict, but has failed to do so.

Washington State Constitution
In addition to the federal Sixth Amendment right to an attorney, the right is also protected by the Washington Constitution, which states: "In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel...." Const. art. I, § 22. Dhaliwal argues that the Washington Constitution provides greater protection of a defendant's right to counsel free from conflict than does the Sixth Amendment. The Court of Appeals did not address this issue, presumably because Dhaliwal raised it for the first time in his reply brief.[11] He again raised the issue in his petition for review to this court.
Yet although Dhaliwal has raised the state constitutional issue, he fails to provide an analysis of the applicable Gunwall factors. In State v. Gunwall, 106 Wash.2d 54, 61, 720 P.2d 808 (1986), this court held that a determination *441 that the Washington Constitution provides more protection than the federal constitution requires the consideration of six factors.[12] Rather than providing an analysis of the Washington Constitution's protection of the right to an attorney free from conflict as required by Gunwall, Dhaliwal simply cites Gunwall for the proposition that the Washington Constitution provides more protection than the federal constitution.
This court has previously declined to engage in a Gunwall analysis if not properly briefed on the issue by the parties. Davis, 141 Wash.2d at 834, 10 P.3d 977; In re Pers. Restraint of Gronquist, 138 Wash.2d 388, 406 n. 12, 978 P.2d 1083 (1999); State v. Wethered, 110 Wash.2d 466, 472, 755 P.2d 797 (1988). We therefore decline to address this issue.

Prosecutorial Misconduct
Dhaliwal asserts that the prosecutor's examination of the witnesses and closing argument indicates that the State's theory of the case was based on improper religious and cultural stereotyping. First, he argues that the prosecutor made a point of questioning the Sikh witnesses about their religion and national origin. However, the record indicates that the defense also routinely made such background inquiries of the witnesses.[13] Dhaliwal also claims that the prosecutor committed misconduct by asking various witnesses about Sikh culture, specifically about the significance of having one's turban knocked off. The defense made similar cultural inquiries of various witnesses.[14] Furthermore, Dhaliwal did not object to the State's questions about Sikh culture at trial.
Dhaliwal also argues that several statements made by the prosecutor during closing argument prejudiced his right to a fair trial.[15] Dhaliwal contends that the prosecutor's references to the Sikh community and religion were designed to imply that the Sikh culture is violent, thus presenting an offensive stereotype of the Sikh religion to the jury. The State, in contrast, argues that the prosecutor's remarks were based on the evidence presented at trial rather than racial or religious stereotyping. The State further asserts that Dhaliwal has failed to show that the remarks of the prosecutor were so flagrant that they could not have been cured by an instruction had Dhaliwal objected at trial.
*442 The Court of Appeals held that the comments made by the prosecutor fell within the latitude allowed in a closing argument. Dhaliwal, 113 Wash.App. at 240, 53 P.3d 65. Because prosecutors are permitted to draw reasonable inferences from the evidence, the court held that the statements in the present case were within the bounds of proper closing argument. Id. at 242, 53 P.3d 65. In addition, the court noted that "[a]ny possibly inappropriate aspect of these comments would easily have been cured by a timely objection and curative instruction."[16]Id.
At trial, "[c]ounsel are permitted latitude to argue the facts in evidence and reasonable inferences" in their closing arguments. State v. Smith, 104 Wash.2d 497, 510, 707 P.2d 1306 (1985); see also State v. Harvey, 34 Wash.App. 737, 739, 664 P.2d 1281 (1983). They may not, however, make prejudicial statements that are not sustained by the record. State v. Rose, 62 Wash.2d 309, 312, 382 P.2d 513 (1963). Nor are prosecutors permitted to state their personal beliefs about the defendant's guilt or innocence or the credibility of the witnesses. State v. Reed, 102 Wash.2d 140, 145, 684 P.2d 699 (1984).
A defendant who alleges improper conduct on the part of a prosecutor must first establish the prosecutor's improper conduct and, second, its prejudicial effect. State v. Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995); State v. Furman, 122 Wash.2d 440, 455, 858 P.2d 1092 (1993). Any allegedly improper statements should be viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions. State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997). Prejudice on the part of the prosecutor is established only where "there is a substantial likelihood the instances of misconduct affected the jury's verdict." Pirtle, 127 Wash.2d at 672, 904 P.2d 245.
Where there is a failure to object to improper statements, it constitutes a waiver unless the statement is "so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury." Brown, 132 Wash.2d at 561, 940 P.2d 546. If the prejudice could have been cured by a jury instruction, but the defense did not request one, reversal is not required. State v. Russell, 125 Wash.2d 24, 85, 882 P.2d 747 (1994). Here, because defense counsel did not object to the statements or request a curative instruction at trial, Dhaliwal must show that the prejudice was so inflammatory that it could not have been defused by an instruction.
In State v. Belgarde, 110 Wash.2d 504, 507-08, 755 P.2d 174 (1988), the prosecutor made comments that this court held could not have been neutralized by a curative instruction, even if there had been an objection at trial. The prosecutor described members of the American Indian Movement (AIM) as "`a deadly group of madmen,'" "`militant,'" and "`butchers, that kill indiscriminately Whites and their own.'" Id. at 506-07, 755 P.2d 174 (emphasis omitted). He also asked the jury to remember the AIM's involvement in Wounded Knee and analogized the AIM to the Irish Republican Army's Sinn Fein and Libya's Kadafi. Id. No objection was made at trial, but this court held that these statements were testimony disguised as a closing argument, stating that "[t]he prosecutor stepped far outside his proper role ... to give the jury highly inflammatory `information.' " Id. at 509, 755 P.2d 174. Because his statements were a deliberate appeal to the jury's passion and could not have been neutralized even had there been an objection or a request for a curative instruction, this court vacated the judgment and remanded for a new trial. Id. at 510, 755 P.2d 174.
In Bains v. Cambra, 204 F.3d 964, 974 (9th Cir.), cert. denied, 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000), the Ninth Circuit reviewed a case in which the prosecutor made generalizations about Sikh people in closing argument, implying they had violent predispositions. In closing, the prosecutor *443 said, "`[i]f you do certain conduct with respect to a Sikh person's female family member, look out. You can expect violence.'" Id. at 975. The court found that this statement was objectionable because it was an attempt to show that all Sikhs, including the defendant, are "irresistibly predisposed to violence when a family member has been dishonored." Id. The court nevertheless found the error harmless. Id. at 977.
The present case is distinguishable from Belgarde and Bains. The statements made by the prosecutor here were based on the evidence presented at trial. The prosecutor used witness testimony to draw inferences in his closing argument, which is permissible under Smith. For example, Grewal testified that in the Sikh community using offensive language and threatening to knock a man's turban off his head are signs of disrespect. In closing, the prosecutor made reference to these cultural values that were brought out during Grewal's testimony as an explanation as to possible motive. In contrast, in Belgarde, the prosecutor had made spontaneous statements not drawn as inferences from prior testimony. 110 Wash.2d at 508-09, 755 P.2d 174.
The statements made in the present case are neither as inflammatory nor as blatantly prejudicial as those in Belgarde. Citing the fact that Farwest board members needed police at shareholder meetings, the prosecutor alluded to "their nature" and how "they operate." 02/13/01 RP at 120. Dhaliwal contends that this indicates the prosecutor was arguing that Sikhs had violent tendencies. However, reviewing the statement in context, the prosecutor appears to have been referring to Farwest as a company rather than to Sikhs, as his statement was made in the context of explaining the decisionmaking process at Farwest rather than within Sikh culture.[17]
Similarly, Dhaliwal characterizes the prosecutor's comment about "[choosing] a path that was all too common within the Far West Cab Company and indeed the Sikh community" as indicating that the prosecutor was characterizing the Sikh community as violent. 02-13-01 RP at 7. However, the "path" that the quote refers to is not violence; rather, it refers to a common method of dealing with conflict within Farwest and the Sikh community, which was to go to the Farwest lot and discuss the differences.[18] This is a far cry from calling a cultural group "madmen" and "butchers" or saying that violence is to be expected from an ethnic group whose family members are dishonored. Further, any prejudicial effect created by these statements could have been cured by an instruction from the court if Dhaliwal had voiced his objection at trial.
Because defense counsel in this case did not object to the statements nor request a curative instruction at trial, Dhaliwal was required to show that the statements were so inflammatory that they could not have been defused by an instruction. The statements made in this case do not rise to such a level. Therefore, we hold that the prosecutor's questioning of the witnesses and closing argument do not constitute misconduct.

III
Dhaliwal's attorney at trial was concurrently representing and had previously represented several of the witnesses for the defense and the State in other matters. Although this indicates the possibility of a conflict of interest, because Dhaliwal did not demonstrate that his attorney acted under an actual conflict of interest adversely affecting his performance, he has failed to show that his Sixth Amendment right to an attorney free from conflict was violated. There being *444 no analysis under Gunwall, Dhaliwal has not established that the Washington Constitution provides greater protection of the right to a conflict-free attorney than does the federal constitution. Finally, Dhaliwal failed to prove that the prosecutor's references to the Sikh culture and religion in closing argument were so prejudicial that they could not have been cured by an instruction if there had been an objection at trial. We therefore affirm the Court of Appeals.
ALEXANDER, C.J., JOHNSON, MADSEN, IRELAND, OWENS, and FAIRHURST, JJ.
CHAMBERS, J. (concurring).
I concur with the result reached by the majority. I write separately to express my strong view that questioning of witnesses and presenting argument based on impermissible stereotypes of members of the Sikh faith as passionate and violent was improper.
It is an established violation of a criminal defendant's federal due process and equal protection rights for a prosecuting attorney to make biased arguments associating the defendant with members of a particular ethnicity, geographic region, or religion. Bains v. Cambra, 204 F.3d 964, 974 (9th Cir.2000). While testimony and arguments about Sikh beliefs relevant to motive and intent may sometimes be constitutionally permissible, prosecutorial arguments inviting the jury to submit to prejudices and stereotypes are not. Id. at 974-75.
From the beginning to the end of Paramjit Dhaliwal's trial, the prosecution maintained a theory of the case that relied in part upon impermissible stereotypes of the Sikh religious community from Punjab, India. Key to this theory was the contention that all Sikhs feel a "sense of deep disrespect" from curse words and having their turbans knocked off. Report of Proceedings (RP) (Feb. 13, 2001) at 2. "[V]irtually every Sikh witness that testified told you about how cursing and swearing is a sign of fundamental disrespect." Id. at 30-31. "[T]he turban was knocked off and how that was a fundamental sign of disrespect." Id. at 32. Additionally, the jury heard that Sikhs "are a very passionate group" that might kill just "because [they] have been disrespected." RP (Jan. 23, 2001) at 19. The jury was being invited to draw the impermissible inference that Dhaliwal, like all other Sikhs, and solely on account of being Sikh, was compelled to murder the next person to disrespect him. The prosecuting attorney returned again to this theme in his closing when he argued that the injury to Dhaliwal's pride could not be healed until "he was able to shoot and kill" a member of the opposing faction for knocking the turban off his head. RP (Feb. 13, 2001) at 33. This argument was improper.
It is improper prosecutorial conduct to invoke the stereotype that members of a particular religious faith are militant and prone to violence. I do not share the majority's confidence that any curative instruction could have cured the prejudice this improper conduct spawned. Freedom from such persecution based upon religion and ethnicity should be a basic right in a free society, jealously guarded by its courts.
I agree with the majority that Dhaliwal has not shown prejudice, but I emphasis a different basis. Dhaliwal was not prejudiced because he also embraced the stereotype that Sikhs are prone to violence to advance his theory of the case; that because his victim was a Sikh, he feared bodily harm from his victim and acted in self-defense. See majority nn. 13 & 14. I conclude that Dhaliwal's failure to object, failure to ask for a curative instruction, and his own interjections of religious stereotypes when combined, constitute waiver; and I concur with the majority in its result.
Two wrongs do not make a right, and theories and arguments based upon racial, ethnic and most other stereotypes are antithetical to and impermissible in a fair and impartial trial.
NOTES
[1] According to the testimony at trial, gathering at the Farwest lot with members of the Sikh temple is a common method of dispute resolution within Farwest.
[2] Several of the men testified at trial that they borrowed the white Honda rather than using one of their Farwest taxis because Farwest could suspend a driver's cab.
[3] Grewal testified at trial that after the shooting, Dhaliwal's friends met frequently to discuss the case and figure out how to show that he acted in self-defense. He testified that he was under pressure to help with Dhaliwal's defense. He also testified that Dhaliwal threatened him with his life and threatened his relatives in India and Canada after their relationship began to sour.
[4] When asked about the potential witnesses that he was representing in other matters, Salazar stated the fourth name simply as "Mr. Sohal." 01/22/01 Report of Proceedings (RP) at 56. Two men with the last name "Sohal" testified at trial, Surinder Sohal for the State and Gurdev Sohal for the defense. The State contends that it is unclear which Mr. Sohal Salazar represented. However, it appears from a portion of the record that the "Mr. Sohal" represented by Salazar in the shareholder action was Surinder Sohal. 01/24/01 RP at 152.
[5] The court asked Dhaliwal if he understood the discussion about conflicts of interest to which he responded "Yes, I do." 01/22/01 RP at 57. The court then stated:

There can arise situations where an attorney representing two different clients can have a conflict of interest because those individuals' interests diverge. It doesn't sound like that is directly a problem in this case. You and Mr. Salazar and these other individuals all know much more than I about that. What's important is that you all have your eyes open to the possibility that there could in some circumstances be a conflict and if there were a conflict, then that would need to be raised so we could take appropriate steps.
Id. at 57-58. Dhaliwal responded: "I have no problem." Id. at 58.
[6] Discussing his reservations about his attorney, the defendant stated: "`I have faith in Mr. Holmes, like I explained to him, but in view that he is going to be going over to the other side, it makesmy reservations are, you know, not that clear as to whether or not he will strike a deal or if he is palsy-walsy with Mr.with the district attorney, Mr. Bowers, so I would like at least two days to consult with people.'" Garcia, 33 F.3d at 1196.
[7] Although the defendant must show an effect on the attorney's performance, he or she need not demonstrate an effect on the outcome or that the verdict itself is unreliable. Mickens, 535 U.S. at 166, 122 S.Ct. 1237.
[8] In addition, the fact that Salazar's representation of Grewal was not ongoing at the time of Dhaliwal's trial may also indicate that there was no conflict. The Sullivan Court implied that the representations must be concurrent for there to be a conflict, stating: "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S. at 350, 100 S.Ct. 1708 (emphasis added). The Mickens court, however, specifically declined to address this issue. 535 U.S. at 173-74, 122 S.Ct. 1237.
[9] In Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court held that courts must be "highly deferential" in their review of an attorney's performance at trial. The Court stated: "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
[10] In particular, the record indicates that Salazar and his cocounsel thoroughly cross-examined those witnesses for the State that Salazar had previously or was currently representing. See 02-05-01 RP at 30-90 (cross-examination of Gurinder Grewal); 02-05-01 RP at 102-115 (recross-examination of Gurinder Grewal); 02-01-01 RP at 81-120 (cross-examination of Surinder Sohal); 02-01-01 RP at 129-31 (recross-examination of Surinder Sohal).
[11] RAP 10.3(c) states that "[a] reply brief should be limited to a response to the issues in the brief to which the reply brief is directed." However, in this case, Mickens was decided after the opening briefs were filed in the Court of Appeals but before the reply brief was filed. Because of this intervening change in the law, raising a new issue in the reply brief is justified. RAP 18.8(a) provides that "[t]he appellate court may, on its own initiative or on motion of a party, waive or alter the provisions of any of these rules ... in a particular case in order to serve the ends of justice...."
[12] The six factors are (1) textual language, (2) significant differences in the texts of the federal and state constitutions, (3) state constitutional and common law history, (4) preexisting state law, (5) differences in structure between the federal and state constitutions, and (6) matters of particular state interest or local concern. Gunwall, 106 Wash.2d at 61-62, 720 P.2d 808.
[13] The defense initiated its examination of most of the Sikh witnesses with questions such as "What country are you from originally?" 02/06/01 RP at 170, "What is your native language?" 02/07/01 RP at 3, and "What religion are you?" 02/06/01 RP at 172. See also 02/06/01 RP at 115; 02/08/01 RP at 84, 105, 122, 136; 02/12/01 RP at 10-12, 36. These inquiries were similar to those made by the prosecutor, who asked questions such as the following: "[C]ould you tell the jury where you are originally from?" 01/30/01 RP at 69-70, "What part of India are you from?" id. at 70, 720 P.2d 808, and "Are you a member of a particular religious group?" Id.
[14] For example, the defense questioned Grewal on cross-examination about various signs of disrespect in Indian culture such as use of the "F word," taking off the turban, abusive language, and allegations of marital infidelity. 02/05/01 RP at 85-86.
[15] In particular, Dhaliwal finds five statements to be prejudicial. First, he alleges that the references to turbans being knocked off further a theme of religious stereotyping. See 02-13-01 RP at 2, 32-34. Second, Dhaliwal argues that the prosecutor was urging the jury to convict Dhaliwal because of his religious faith when he stated that "the men in the Honda chose a path that was all too common within the Far West Cab Company and indeed the Sikh community." 02-13-01 RP at 7. Third, Dhaliwal claims that because a miniature sword is a Sikh religious symbol, it was prejudicial for the prosecutor to state that "self-defense is not reserved to be used as a sword by a faction within an insulated cultural group...." 02-13-01 RP at 28. Fourth, Dhaliwal argues that the prosecutor impermissibly perpetuated a religious theme when he stated: "I agree that the Sikh community is a close-knit community. It's culturally insulated. Pretty much everyone knows everyone else." 02-13-01 RP at 109. Fifth, Dhaliwal asserts that the prosecutor was implying that Sikhs were violent when, in reference to how disputes are resolved at Farwest, he stated, "They even have to have police come to their shareholders' meetings. That is their nature. I mean, that is how they operate." 02-13-01 RP at 120.
[16] Dhaliwal's attorney did not object to any of the prosecutor's closing argument at trial. Dhaliwal, 113 Wash.App. at 241, 53 P.3d 65.
[17] The prosecutor's complete statement was: "[T]here's not a decision made in that company that's not contested. They even have to have police come to their shareholders' meetings. That is their nature. I mean, that is how they operate." 02-13-01 RP at 120.
[18] The nature of the prosecutor's comment can be more easily understood when read in context:

They did not heed the advice of Mr. Singh or Mr. Sohal. Rather the men in the Honda chose a path that was all too common within the Far West Cab Company and indeed the Sikh community.... [I]t was not something completely out of the ordinary to be confronted about the difference, to take the difference to the lot, to the office to be resolved.
02/13/01 RP at 7-8.