228 P.3d 771 (2010)
STATE of Washington, Respondent,
v.
Roger I. FUALAAU, Appellant.
No. 62746-5-I.
Court of Appeals of Washington, Division 1.
April 5, 2010.
*773 David Koch, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.
Andrea Vitalich, King County Prosecutor's Office, Seattle, WA, for Respondent.
DWYER, A.C.J.
¶ 1 Roger Fualaau appeals from the judgment entered on a jury's verdict finding him guilty of assault in the first degree, with a firearm sentencing enhancement, and two counts of kidnapping in the first degree. Fualaau contends that the trial court abused *774 its discretion by admitting into evidence his testimony from a previous trial in which he described committing a prolonged assault. However, given the similarities between the prior assault and the assault charged herein, especially the two assaults' shared ritualistic qualities, the trial court properly admitted this evidence, pursuant to ER 404(b), on the issue of identity. Fualaau further contends that the trial court erred by denying his attorney's motion to withdraw due to a purported conflict of interest that Fualaau himself created by assaulting the attorney in front of the jury. Holding that a defendant cannot force the appointment of a new attorney by assaulting his present counsel and that the assault neither created an actual conflict of interest nor resulted in a discernable adverse effect on the attorney's trial performance, we affirm.

I
¶ 2 When Stu Fualaau,[1] the defendant's brother, was pulled over for driving a stolen car, police officers found a machine gun. Stu's acquaintance, John Hough, agreed to tell police that the gun was his and that he had mistakenly left it in the stolen car. On February 27, 2007, Hough went to the county courthouse with Stu to try to convince the court that the gun was Hough's, but, when they arrived, Stu was arrested on other charges.
¶ 3 That same day, after learning of his brother's arrest, Fualaau asked an associate to bring Hough to a garage where Fualaau was waiting. Upon arrival, Hough sat on a box next to Fualaau. Fualaau is a paraplegic who uses a wheelchair. Fualaau pointed a handgun at Hough and asked him if he would prefer to be shot in the leg or in the head. He then shot the box that Hough was sitting on and punched Hough in the face. Next, Fualaau put the gun against the inside of Hough's thigh and shot him. Fualaau then made Hough get down on his hands and knees, hit him in the back of the head with a metal bar, and pistol-whipped him. Fualaau forced Hough to strip naked and lie on the floor, face-down, while Fualaau stabbed him in the shoulder blade with a small knife. Several of Fualaau's associates were standing around watching, and Fualaau invited them to kick Hough. One of these associates then handed Fualaau a hand-held blow torch, which Fualaau used to burn Hough's back.
¶ 4 At that point, another of the associates intervened and lifted Hough onto a shelf where Fualaau could not reach him. Fualaau agreed to let Hough be taken to a hospital on the condition that Hough attribute his injuries to having been attacked by a Mexican gang. When police questioned Hough, he told them the fabricated story, but they did not believe him.
¶ 5 After Hough was released from the hospital, he tried to stay out of sight by moving from motel to motel. Eventually, a police officer located him and, upon further questioning, Hough admitted that he had been shot by Fualaau. The officer tried to find Fualaau, but his efforts were unsuccessful.
¶ 6 Meanwhile, Fualaau was becoming increasingly worried about the situation with Hough. On March 17, 2007, upon learning that Hough was staying at a nearby motel, Fualaau directed two of his associates to bring Hough to him. These associates found Hough and forced him into their car. On their way to Fualaau, the car was stopped by police officers, who discovered Hough in the back seat. Hough told the officers that he had been kidnapped. Shortly thereafter, Fualaau was arrested.
¶ 7 Fualaau was charged with assault in the first degree with a firearm sentencing enhancement and one count of kidnapping in the first degree, based on the events inside the garage on February 27, 2007. He was charged with a second count of kidnapping based on the March 17, 2007 events.
¶ 8 During pretrial motions, the State indicated its intent to present Fualaau's prior testimony from the murder trial of Neelesh Phadnis as tending to prove Fualaau's identity as the perpetrator of the February 27 *775 kidnapping and assault. The State argued that Fualaau's testimony revealed that he had kidnapped and tortured Phadnis in much the same manner as he had kidnapped and tortured Hough. Further, the State contended that identity was at issue because Fualaau had indicated that he was going to present an alibi defense.
¶ 9 Fualaau moved to exclude the testimony, arguing that the prior testimony was not necessary to prove identity because the State was going to present evidence from two live witnesses who would assert that he had committed the current offenses. He further contended that the two incidents were not sufficiently similar to warrant admission of the prior conduct evidence and that the evidence was unfairly prejudicial.
¶ 10 Although the trial court agreed that the potential prejudicial effect of admitting the prior testimony was "extremely high," the court deemed it admissible. In so ruling, the trial court reasoned that Fualaau's proffered alibi defense placed the question of identity squarely at issue. The trial court further explained that Fualaau's assault on Phadnis bore striking similarities to the crimes committed against Hough and "the method employed in the commission of both crimes is unique such that proof the defendant committed one of these crimes creates a high probability that he also committed the crimes with which he is charged."
¶ 11 During the State's case in chief, Fualaau's prior testimony was read into evidence. Prior to the jury hearing this testimony, the court issued a limiting instruction, advising the jurors to consider the evidence only for the purposes of proving the identity, motive, or intent of the defendant. In this testimony, Fualaau described a prolonged assault he had committed in 2002 against Phadnis, motivated by his suspicions that Phadnis had set fire to Fualaau's in-laws' house. Fualaau described the assault as a "sasa"a Samoan term for the practice of disciplining someone through the use of physical force. Fualaau testified that he repeatedly struck Phadnis on the legs and shoulders with a small metal baton while cursing at him and punching him in the mouth. Fualaau further testified that he and Phadnis moved to a second location, where Fualaau forced Phadnis to lie on the floor while Fualaau hit Phadnis on the back with the flat side of a machete. Eventually, Fualaau's father-in-law intervened and ended the assault. After making Phadnis apologize to his father-in-law and mother-in-law, Fualaau gave Phadnis some clean clothing and put ointment on his wounds.
¶ 12 After the State finished reading Fualaau's prior testimony to the jury, it rested its case in chief. The next day, the defense called Fualaau's alibi witness to testify. During cross-examination of this witness, Fualaau became increasingly agitated. The court called a recess so that defense counsel could confer with Fualaau. Before the jurors could leave the courtroom, however, Fualaau lunged at his attorney, grabbed hold of him with both arms, and said something about needing his psychiatric medication. A corrections officer intervened and forced Fualaau to release his lawyer. After the jury left the courtroom, Fualaau's attorney moved for a mistrial and to withdraw from the case. Rather than immediately rule on the motions, the trial judge ordered proceedings adjourned for the day.
¶ 13 The next day, Fualaau's attorney indicated that he had spoken to his client about the incident and renewed his motion for a mistrial and his motion to withdraw. The attorney claimed that he had a conflict of interest because he had to give a report to law enforcement about the incident, he could potentially be called as a witness to the assault, and he had concerns about his personal safety. The attorney also stated that he could not make an argument that he had intended to make to the jury: that Fualaau was not physically capable of the acts he was accused of committing because he was wheelchair-bound. In response, the State noted that it would have a difficult time retrying the case because both witnesses had left the state and it would be difficult to convince them to return to the state because they feared for their safety. The trial court denied both motions, finding that Fualaau's outburst was intentional and calculated to create a conflict and promote a mistrial and that Fualaau's experienced defense counsel would *776 be able to effectively continue his representation.
¶ 14 In light of the trial court's ruling, Fualaau's attorney requested a recess in order to attempt to reestablish rapport and effective communication with Fualaau. The trial court granted defense counsel's request. When the proceedings resumed six days later, the parties informed the court that the defense would be resting its case. Although defense counsel renewed his motion to withdraw for the record, he stated no new grounds for this motion, which was again denied.
¶ 15 The jury convicted Fualaau as charged. At sentencing, Fualaau thanked his attorney for his diligent representation.
¶ 16 Fualaau now appeals.

II
¶ 17 Fualaau first contends that the trial court erred by admitting his prior testimony describing his assault of Phadnis. We disagree.
¶ 18 Our Supreme Court has described the inquiry in which we are to engage in resolving Fualaau's contention:
Washington ER 404(b) provides:
Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
This Court reviews decisions to admit evidence under ER 404(b) for abuse of discretion. State v. Dennison, 115 Wash.2d 609, 627-28, 801 P.2d 193 (1990). Discretion is abused if it is exercised on untenable grounds or for untenable reasons. State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971). Alternatively, the Court considers whether any reasonable judge would rule as the trial judge did. State v. Nelson, 108 Wash.2d 491, 504-05, 740 P.2d 835 (1987).
To admit evidence of other wrongs, the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. State v. Lough, 125 Wash.2d 847, 853, 889 P.2d 487 (1995).
State v. Vy Thang, 145 Wash.2d 630, 642, 41 P.3d 1159 (2002).
¶ 19 Fualaau contends that the trial court abused its discretion because (1) the evidence was not relevant to the question of identity and (2) the probative value of the evidence was outweighed by its prejudicial effect.
¶ 20 Evidence of other crimes is relevant for the purposes of establishing identity when the method employed to commit each crime is so distinctive "that proof that an accused committed one of the crimes creates a high probability that he also committed the other crimes with which he is charged." State v. Russell, 125 Wash.2d 24, 66-67, 882 P.2d 747 (1994). The greater the distinctiveness, the higher the probability that the defendant committed the crime, and thus the greater the relevance of the proffered evidence. Thang, 145 Wash.2d at 643, 41 P.3d 1159 (citing State v. Coe, 101 Wash.2d 772, 777-78, 684 P.2d 668 (1984)).
¶ 21 Even where the common features of the crimes are not individually unique, such that they "amount to a signature," the "appearance of several features in the cases to be compared, especially when combined with a lack of dissimilarities, can create sufficient inference that they are not coincidental, thereby justifying the trial court's finding of relevancy." Thang, 145 Wash.2d at 644, 41 P.3d 1159. The critical determination for the trial court to make is whether there are sufficient similarities between the crimes to make evidence of the prior crime probative of the defendant's identity as the perpetrator of the crime charged.
¶ 22 When two crimes share a ritualistic quality, a defendant's description of his commission of one of the crimes is strongly probative of the defendant's identity as the *777 perpetrator of the other. Thus, to be properly admissible, where the facts of two crimes indicate a shared ritualistic behavior, the degree of similarity between the crimes can be less than that required for crimes that do not contain such a similarity. Accordingly, in Russell, our Supreme Court found sufficient similarity to support admissibility under ER 404(b) where all three murder victims were posed after death in sexually explicit ways, despite the fact that the three bodies had been posed in different ways and were found in differing locations. 125 Wash.2d at 67-68, 882 P.2d 747.
¶ 23 In this case, the two assaults share a ritualistic quality. In each, the assault is consistent with a ritual punishmentwhat Fualaau termed a "sasa"in retaliation for what Fualaau perceived as his relatives being harmed by the actions of the assault victims. Both victims were verbally abused while being physically attacked. A variety of weapons were used on both victims and both were forced to lie on the ground as they were either stabbed, burned, and beaten with a metal bar or beaten with a metal baton and a machete. In each case, the attack lasted over a prolonged period of time, was witnessed by a crowd of people, and ended only after a third party intervened. Finally, after both assaults, Fualaau had the victim cleaned up and provided with medical attention. Because of the ritualistic qualities of the similarities between these assaults, evidence that Fualaau committed the first is strongly probative of his identity as the perpetrator of the second, notwithstanding any dissimilarities between the two events.
¶ 24 Fualaau further contends that the evidence should nevertheless have been excluded because its probative value was outweighed by its prejudicial effect. To ensure thoughtful consideration and to facilitate appellate review of an ER 404(b) ruling, the trial court must make a record of its balancing of the probative value of evidence versus its potential prejudice. State v. Jackson, 102 Wash.2d 689, 694, 689 P.2d 76 (1984). The trial court has wide discretion in determining this balance. State v. Stenson, 132 Wash.2d 668, 702, 940 P.2d 1239 (1997). The trial court herein found:
This evidence will likely have serious prejudicial impact because of the violent nature of the beating the defendant admitted to inflicting on Mr. Phadnis. However, this is outweighed by the fact that the crime is no more heinous then the crimes he is currently charged with and the method employed in the commission of both crimes is unique such that proof the defendant committed one of these crimes creates a high probability that he also committed the crimes with which he is charged.
The trial court's balancing process is on the record. The trial court acted well within the bounds of its discretion in ruling on this issue. There was no error.

III
¶ 25 Fualaau next contends that the trial court erred by denying his attorney's motion to withdraw due to a purported conflict of interest created when Fualaau assaulted the attorney in open court. We disagree.
¶ 26 The trial court found that Fualaau's outburst was intentional and calculated to create a conflict of interest and force a mistrial. The trial court denied the attorney's motion, recognizing a policy consideration in not rewarding criminal actions engaged in by criminal defendants in the midst of trial. We agree with the trial court that such a policy exists.
¶ 27 A criminal defendant cannot force the withdrawal of his court appointed attorney and the appointment of a new attorney simply by assaulting his present counsel during the trial. "Substitution of counsel is an instrument designed to remedy meaningful impairments to effective representation, not to reward truculence with delay." People v. Linares, 2 N.Y.3d 507, 512, 780 N.Y.S.2d 529, 813 N.E.2d 609 (2004). Other jurisdictions have refused to recognize a rule of law that would empower criminal defendants to inject reversible error into their trials by threatening their lawyers:
We rely in the first instance on our trial courts to determine whether a criminal defendant is represented by an attorney truly laboring under conflicting interests or whether the defendant has simply engineered *778 an apparent conflict in an attempt to delay the ultimate moment of truth, the jury's verdict.
People v. Roldan, 35 Cal.4th 646, 675, 27 Cal.Rptr.3d 360, 110 P.3d 289 (2005).
¶ 28 A defendant's misconduct toward his attorney does not necessarily create a conflict of interest. Where the defendant's actions do not create an actual conflict of interest adversely affecting the attorney's performance, the defendant is not entitled to a new attorney. State v. Dhaliwal, 150 Wash.2d 559, 571, 79 P.3d 432 (2003). However, even in circumstances wherein the defendant's wrongful actions create an actual conflict of interest, the defendant may properly be denied substitution of counsel.
¶ 29 Defendants can forfeit their Sixth Amendment rights by misconduct. See, e.g., State v. Mason, 160 Wash.2d 910, 924, 162 P.3d 396 (2007) (defendants who are responsible for a witness's unavailability at trial forfeit their Sixth Amendment right to confront the missing witness). A defendant may forfeit his Sixth Amendment right to counsel by engaging in "egregious misconduct." City of Tacoma v. Bishop, 82 Wash. App. 850, 860, 920 P.2d 214 (1996). Thus, a defendant who threatened his attorney with physical bodily harm and attempted to persuade his attorney to engage in unethical conduct in connection with the case was held to have forfeited his right to the assistance of counsel. United States v. McLeod, 53 F.3d 322, 326 (11th Cir.1995). Forfeiture by misconduct "is grounded in equitythe notion that people cannot complain of the natural and generally intended consequences of their actions." Mason, 160 Wash.2d at 926, 162 P.3d 396. Hence, where a defendant intentionally creates a conflict of interest with his or her attorney, that defendant may be deemed to have forfeited either the right to the assistance of counsel or the right to the assistance of counsel free of the conflict created.
¶ 30 When a defendant misbehaves in a courtroom, the trial judge "must be given sufficient discretion" to determine the appropriate course of action. Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). "No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." Allen, 397 U.S. at 343, 90 S.Ct. 1057. Hence, even where the defendant's misconduct causes a conflict of interest with defense counsel, the trial court is not necessarily required to grant the attorney's motion to withdraw, thus necessitating the substitution of new counsel. Rather, depending upon the circumstances extant, the trial court may require the defendant to proceed pro se or may require the attorney to continue representing the defendant. The trial court is in the best position to consider the appropriate options.
¶ 31 The trial court herein determined not to reward Fualaau's criminal action, taken against his attorney in the midst of the trial.[2] In determining the appropriate course of action, the trial court wisely weighed the need to safeguard Fualaau's Sixth Amendment rights against considerations such as the safety of the witnesses and the frustration of justice attendant to a mistrial. Thus, even had Fualaau's actions created an actual conflict of interest, he would not necessarily have been entitled to the substitution of new counsel.[3]

IV
¶ 32 This case, however, does not present us with a situation in which defense counsel, laboring under a conflict of interest, *779 was forced to continue. In fact, there was no conflict of interest created herein.
¶ 33 A conflict of interest exists when a defense attorney owes duties to a party whose interests are adverse to those of the defendant in the context of a particular representation. State v. White, 80 Wash. App. 406, 411-12, 907 P.2d 310 (1995). In this case, the burden is on Fualaau to demonstrate, from the record, that an actual conflict of interest adversely affected his attorney's performance. Mickens v. Taylor, 535 U.S. 162, 173-74, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); Dhaliwal, 150 Wash.2d at 573, 79 P.3d 432. Our Supreme Court has held that even where a defendant "has demonstrated the possibility that his attorney was representing conflicting interests," the defendant nevertheless "failed to establish an actual conflict" where he did not demonstrate how his attorney's conflict of interest affected his attorney's performance at trial. Dhaliwal, 150 Wash.2d at 573, 79 P.3d 432. Although a defendant need not demonstrate that the outcome of the trial would have been different but for the conflict, the defendant must show that "`some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" State v. Regan, 143 Wash.App. 419, 428, 177 P.3d 783 (2008) (internal quotation marks omitted) (quoting United States v. Stantini, 85 F.3d 9, 16 (2d Cir.1996)).
¶ 34 Fualaau points to the fact that, after the assault in court, his attorney did not call witnesses to testify that Fualaau was physically incapable of committing the crimes with which he was charged, as was originally planned. Fualaau claims that only one inference can be drawn from this fact: that this tactic was not pursued because it would have conflicted with his attorney's personal interests as Fualaau's assault victim. We disagree.
¶ 35 At least two other plausible inferences can be drawn from the fact that Fualaau's attorney chose not to call such witnesses to testify. First, the testimony that these witnesses intended to offer may have been inconsistent with that which the jury had witnessed. The record indicates only that these witnesses were going to testify that Fualaau was physically incapable of committing the crimes with which he was charged, it does not indicate what level of physical inability the witnesses were going to attribute to Fualaau. Furthermore, the record does not contain a detailed description of the attack; rather, the only description is that Fualaau lunged toward his attorney and grabbed onto him with both hands. Thus, it is possible that Fualaau's movement was incompatible with that to which the witnesses had planned to testify.
¶ 36 Second, even before the in-court assault, Fualaau's attorney may have already been concerned that presenting the testimony of these witnesses would cause a loss of credibility with the jury, because such testimony would greatly conflict with that which the jury had learned about Fualaau's physical abilities from his own testimony about his actions given during the Phadnis murder trial. It may have been that Fualaau's attorney believed that he could not present the testimony of these witnesses without losing credibility with the jury. In either case, defense counsel's decision not to call the additional witnesses falls well within the ambit of sound trial strategy.[4]See State v. Hendrickson, 129 Wash.2d 61, 77-78, 917 P.2d 563 (1996) ("Deficient performance is not shown by matters that go to trial strategy or tactics.")
¶ 37 Moreover, had the trial court granted a mistrial, and had Fualaau's next attorney raised the defense of physical impossibility, this claim of impossibility may have been rebutted by evidence of Fualaau's assault against his lawyer. Any witness to this assault would have been a competent witness and subject to being called to so testify. Thus, Fualaau has failed to demonstrate that he was in any way deprived of the defense of physical impossibility due to a conflict of interest with his attorney.
*780 ¶ 38 Fualaau makes two additional arguments in support of his claim that an actual conflict of interest existed. First, he argues that there was an actual conflict because his attorney was a witness against him. Indeed, when an attorney testifies against his client during the course of representation, he has an actual conflict of interest. Regan, 143 Wash.App. at 430, 177 P.3d 783. However, an actual conflict of interest is more than "`a mere theoretical division of loyalties.'" Dhaliwal, 150 Wash.2d at 570, 79 P.3d 432 (quoting Mickens, 535 U.S. at 171, 122 S.Ct. 1237). "The mere possibility of a conflict of interest is not sufficient to `impugn a criminal conviction.'" State v. Davis, 141 Wash.2d 798, 861, 10 P.3d 977 (2000) (quoting Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). Thus, the possibility that an attorney may have to testify against the client in the future does not create an actual conflict of interest, particularly where such testimony would occur only after the attorney ceased active representation or where there is no certainty that such testimony will occur at all. See United States v. Ettinger, 344 F.3d 1149, 1161 (11th Cir.2003). Accordingly, the mere possibility that Fualaau's attorney might be called to testify against Fualaau at a subsequent assault trial did not create an actual conflict of interest.
¶ 39 Fualaau next claims that the conflict of interest was actual, rather than potential, because his attorney was required to give law enforcement a report on the attack. However, giving a report to law enforcement merely creates the potential for a conflict, as it could lead to further action in which the attorney testifies against his client in a proceeding separate from the one in which representation is provided. It is not a conflict in and of itself. See, e.g., State v. Sinclair, 46 Wash.App. 433, 437, 730 P.2d 742 (1986) (filing a formal complaint against one's lawyer with the state bar association does not create a conflict).
¶ 40 Finally, Fualaau contends that the assault caused a breakdown of communication between attorney and client. A trial court should ordinarily grant counsel's motion to withdraw when there has been a complete breakdown of communication. Stenson, 132 Wash.2d at 734, 940 P.2d 1239. However, nothing in the record indicates that there was a complete breakdown of communication between Fualaau and his attorney. Indeed, the day after the incident, defense counsel indicated that he had spoken to Fualaau about the incident. Moreover, the trial court granted the defense a six day recess so that defense counsel could reestablish rapport with Fualaau and decide how best to proceed. When court reconvened, defense counsel renewed his motion to withdraw but did not indicate that there had been a breakdown of communication between himself and Fualaau. Strikingly, during his allocution at sentencing, Fualaau thanked his attorney for his diligent representation.
¶ 41 There was no error.
¶ 42 Affirmed.
We concur: LAU and ELLINGTON, JJ.
NOTES
[1] To avoid confusion, we will refer to Stu Fualaau as "Stu," while referring to Roger Fualaau by his last name.
[2] The trial court found that Fualaau's goal in committing a crime in the courtroom was to force a mistrial. If a substitution of counsel had been ordered, Fualaau's new attorney would likely have requested either a mistrial or a lengthy continuance in order to become familiar with the case. Owing to the difficulties of retaining jurors during a lengthy continuance, such a move would also have likely resulted in the declaration of a mistrial, thus allowing Fualaau to achieve his goal.
[3] On appeal, Fualaau contends that the trial court erred by not granting his attorney's motion to withdraw and forcing him to proceed pro se. However, at trial, Fualaau did not raise forfeiture as an option for the trial court to consider. The trial court acted well within its discretion in choosing to have Fualaau's attorney continue to represent Fualaau for the remainder of the trial.
[4] We emphasize that no complete offer of proof was made to the trial court as to the exact nature of the proposed testimony of these witnesses.