

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72158-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| BENJAMIN BATSON, JR., | ) | PUBLISHED |
| | ) | |
| Appellant. | ) | FILED: June 6, 2016 |
| | ) | |

Cox, J. — Benjamin Batson appeals his judgment and sentence that is based on his conviction of failure to register as a sex offender, violating RCW 9A.44.132(1)(b). Among other things, he claims that insufficient evidence supports his conviction. Because the State failed in its burden to prove beyond a reasonable doubt that Batson lacked a "fixed residence" during the charging period, we agree. Accordingly, we reverse and dismiss.

This disposition means that we need not address the constitutional and other challenges raised in the briefing and Statement of Additional Grounds. Thus, we do not further address these challenges.

In 1984, the state of Arizona convicted Batson of two counts of sexual conduct with a minor under the age of 18, a felony in that state. In 2011, Batson pleaded guilty to failing to register as a sex offender in King County, Washington.

In December 2011, Batson registered as a sex offender with the King County Sheriff's Office. He listed the St. Martin de Porres Shelter, a homeless shelter program, as his residence. He did not subsequently file any change of address form with the sheriff's office.

On April 11, 2013, Batson was released from custody in Pierce County. He had been charged with the felony of failing to register as a sex offender during an amended charging period in March 2009. After this release from custody, the State charged Batson in King County with failing to register as a sex offender. It alleged that he failed to comply with the registration requirements for the charging period from April 19, 2013 to September 8, 2013.

At trial, the State specifically argued that Batson lacked a "fixed residence," as defined by RCW 9A.44.128. Accordingly, the State argued that he was required to report to the King County Sheriff's Office on a weekly basis under RCW 9A.44.130(6)(b).

At trial, the State sought to meet its burden to prove that Batson lacked a "fixed residence" during the charging period with testimony from the director of the St. Martin de Porres Shelter program. Batson did not testify at trial.

The jury convicted him as charged. The trial court denied Batson's CrR 7.4 motion to arrest judgment based on insufficient evidence that he lacked a "fixed residence" during the charging period.

Batson appeals.

## SUFFICIENCY OF EVIDENCE

Batson argues that insufficient evidence supports his conviction. We hold that the State failed in its burden to prove beyond a reasonable doubt that Batson lacked a "fixed residence," which is the basis for weekly reporting. Accordingly, there is insufficient evidence to support this conviction.

Evidence is sufficient when any rational trier of fact could find beyond a reasonable doubt the essential elements of the crime.[1] When considering a sufficiency challenge, we defer to the jury's determination as to the weight and credibility of the evidence.[2] "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it."[3] Whether evidence is sufficient is a question of constitutional law that we review de novo.[4]

RCW 9A.44.130(1)(a) requires certain sex offenders to register with the county sheriff. RCW 9A.44.130 has many detailed procedural requirements. One such requirement is that offenders who lack a "fixed residence" must report weekly to the sheriff of the proper county.[5]

RCW 9A.44.132 criminalizes failing to register as a sex offender. To obtain a conviction under this statute, the State must prove that the offender had

---

[1] State v. Green, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980).

[2] State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

[3] State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

[4] State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

[5] RCW 9A.44.130(6)(b).

3

a duty to register and did not comply with RCW 9A.44.130's registration requirements.[6]

In some circumstances, this requires that the State prove a negative. For example, in State v. Prestegard, the State alleged that Keith Prestegard violated RCW 9A.44.130 by failing to register his change of address.[7] Thus, "the State had to prove a negative: that Prestegard did not reregister after he moved."[8]

Here, the State proposed and the court gave Instruction 8, the "to-convict" instruction, which stated in relevant part:

> To convict the defendant of the crime of failure to register as a sex offender, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That the defendant was previously convicted of a felony sex offense;
>
> (2) That due to this conviction, the defendant was required to register in the State of Washington as a sex offender between April 19, 2013, and September 8, 2013; and
>
> (3) That during that time period, the defendant knowingly failed to comply with a requirement of sex offender registration: A requirement of sex offender registration is that a person who lacks *a fixed residence* must report weekly, in person, to the sheriff of the county where he or she is registered.[9]

Instruction 7 was similarly worded, stating:

> A person commits the crime of felony failure to register as a sex offender when that person, having been convicted of a felony sex offense for which he is required to register as a sex offender

---

[6] RCW 9A.44.132.

[7] 108 Wn. App. 14, 18, 28 P.3d 817 (2001).

[8] Id. at 19.

[9] Clerk's Papers at 449 (emphasis added).

with the county sheriff's office, knowingly fails to comply with the requirement of sex offender registration.

A requirement of sex offender registration is that a person *who lacks a fixed residence* must report weekly, in person, to the sheriff of the county where he or she is registered.[10]

The State also proposed and the court gave Instruction 13, which stated:

A fixed residence means a building that a person lawfully and habitually uses as living quarters a majority of the week. Uses as living quarters means to conduct activities consistent with the common understanding of residing, such as sleeping; eating; keeping personal belongings; receiving mail; and paying utilities, rent, or mortgage.

A shelter program may qualify as a residence provided it is a shelter program designed to provide temporary living accommodations for the homeless, provides an offender with a personally assigned living space, and the offender is permitted to store belongings in the living space.[11]

The term "fixed residence" is an important focus of both the "to convict" instruction and Instruction 13. A lack of sufficient evidence of a "fixed residence" is fatal to the conviction. Because this term is defined by statute, we look to the relevant statutory language to determine its meaning.

Construction of a statute is a question of law that we review de novo.[12] Our fundamental objective in reading a statute is to ascertain and carry out the legislature's intent.[13] If a statute's meaning is plain, we give effect to that

---

[10] Id. at 448 (emphasis added).

[11] Id. at 454.

[12] Citizens All. for Prop. Rights Legal Fund v. San Juan County, 184 Wn.2d 428, 435, 359 P.3d 753 (2015).

[13] Id.

meaning.[14] When a statute defines a term, that definition controls.[15] "In criminal cases, we apply the rule of lenity to ambiguous statutes and interpret the statute in the defendant's favor."[16]

In RCW 9A.44.128(5), the legislature defined the term "fixed residence" for the purposes of RCW 9A.44.130 in relevant part as follows:

> "Fixed residence" means a building that a person lawfully and habitually uses as living quarters a majority of the week. Uses as living quarters means to conduct activities consistent with the common understanding of residing, such as sleeping; eating; keeping personal belongings; receiving mail; and paying utilities, rent, or mortgage. . . . *A shelter program may qualify as a residence provided it is a shelter program designed to provide temporary living accommodations for the homeless, provides an offender with a personally assigned living space, and the offender is permitted to store belongings in the living space.*[17]

As this definition states, a shelter program qualifies as a "fixed residence" if it meets three criteria. First, it must be designed to provide temporary living accommodations for the homeless. Second, it must provide an offender with a personally assigned living space. Finally, the offender must be permitted to store belongings in the living space.[18]

Notably, "[l]acks a fixed residence" is defined as:

> mean[ing] the person does not have a living situation that meets the definition of a fixed residence and includes, but is not limited to, a shelter program designed to provide temporary living

---

[14] Id.

[15] State v. Sullivan, 143 Wn.2d 162, 175, 19 P.3d 1012 (2001).

[16] State v. Conover, 183 Wn.2d 706, 712, 355 P.3d 1093 (2015).

[17] (Emphasis added.)

[18] RCW 9A.44.128(5).

accommodations for the homeless, an outdoor sleeping location, or locations where the person does not have permission to stay.[19]

Thus, a shelter program that does not meet the definition of a "fixed residence" does not qualify for purposes of the registration requirements.

In this case, the sole evidence about the St. Martin de Porres Shelter program was provided at trial by its director. Notably, both sides point to this evidence in their appellate briefing to support conflicting arguments. Accordingly, we quote the material portions of this evidence:

[The State:] How does the shelter [program] serve [clients]?

[Shelter Director:] We provide mats on the floor to come sleep at night. We are open from 6:30 at night to 7:30 in the morning. At 7:30, we are closed for the day until we open back up at night. We have nursing services there, drug and alcohol counselors, mats on the floor to sleep on, shower facilities, and evening meal[s].

[The State:] When you say "mats on the floor to sleep on," is that in a common sleeping area?

[Shelter Director:] Right. Yes, it is.

[The State:] These are not beds, but pads on the floor?

[Shelter Director:] Yes. Sleeping mattresses.

[The State:] How many mats are there?

[Shelter Director:] 212.

[The State:] Are these mats filled on a first come, first served basis?

[Shelter Director:] First come, first served for your first night. Once you are there, that's your mat to stay on as long as you want.

[The State:] What if you don't come?

---

[19] RCW 9A.44.128(9).

[Shelter Director:] If you don't show up, we will give to—we turn away people every night. If you don't show up on a given night, we give it to someone else. If you access the shelter, you have to go through a waiting list.

. . . .

[The State:] What do people do with belongings during the day?

[Shelter Director:] During the day, we do have storage boxes and hooks that get assigned to them. Some leave items there during the day and off the streets so they don't have to keep bringing it back, trying to walk around. And then we have access three times a night that we open up the storage.

[The State:] Can you tell me: Are there cubbies and bins for storage also?

[Shelter Director:] Yeah.

[The State:] How do those work?

[Shelter Director:] Same way. Same way. Cubbies down in the main floor. Then there is bigger ones upstairs.

. . . .

[The State:] Do people enter into a formal agreement to live there, or a written agreement?

[Shelter Director:] No, no, because it's supposed to be a temporary shelter. It can turn out to be permanent, but all we have is people who play by the rules.

[The State:] Are there some people that stay there for a long time?

[Shelter Director:] Yes, there is.

[The State:] Do they stay for a long time because they come every night and have a mat?

[Shelter Director:] Come every night and have a mat, yes. One of the biggest reasons for being there is lack of affordable housing.

. . . .

[The State:] Do people have a personally assigned sleeping space?

8

[Shelter Director:] It's just that once they get a mat assigned to them, once they get one assigned to them, it's theirs. It's theirs until they miss a night.

[The State:] During the day, people aren't allowed to stay there; is that right?

[Shelter Director:] No. We have one exception to that the landlord has allowed. That's a very small program, 10 guys during the day.[20]

Here, the question is whether this uncontroverted evidence about the St. Martin de Porres Shelter program is sufficient to establish that Batson lacked a "fixed residence" during the charging period. Looking at the evidence in the light most favorable to the State, we conclude that it failed to prove that he lacked a "fixed residence," as the jury instructions required.

This term requires that an accused does not have a living situation that meets the definition of a "fixed residence."[21] Thus, our focus is on the second paragraph of Instruction 13, which is based on RCW 9A.44.128(5).

Focusing on that paragraph, there is no dispute that the St. Martin de Porres Shelter program "provide[s] . . . temporary living accommodations for the homeless."[22] The director's testimony establishes that its clients eat, sleep, and store personal belongings at the shelter program—"activities consistent with the

---

[20] Report of Proceedings (June 17, 2014) at 111-14.

[21] RCW 9A.44.128(5).

[22] Id.

9

common understanding of residing."[23] And the program's services are intended to be temporary.

We next consider whether the shelter program "provides . . . a personally assigned living space."[24] We conclude that the evidence in this record establishes this.

Here, the director testified in direct response to the prosecutor's question that clients get sleeping mats assigned to them on a first-come, first-served basis. Significantly, once clients receive an assigned mat, it's theirs to keep until they miss a night. In short, the sleeping mats, in this case, constitute the personally assigned living space for clients until they miss a night.

The State argues that this shelter program does not personally assign living spaces because it has a common living area.[25] But the term "living space" in the statute does not exclude common living areas. And it is not surprising to this court that shelter programs may often provide services in a common living area. In our view, a reasonable interpretation of "living space" in this jury instruction and statute includes the assignment of sleeping mats under the circumstances of this case.

Further, even if we were to conclude that the term "living space" could be reasonably interpreted to exclude common living areas, the statute would be

---

[23] Id.

[24] Id.

[25] Brief of Respondent at 33-34.

ambiguous. Thus, under the rule of lenity applicable to criminal statutes, we would interpret the statute in Batson's favor.[26]

In any event, the State fails to support its argument by any citation to authority. We assume it has found none.

We turn to the final clause of the second paragraph of the instruction. The question is whether the clients of the shelter program are "permitted to store belongings in the living space."

We read this requirement to be one of proximity of storage for personal belongings to the personally assigned living space. A close reading of the record shows that the State failed to fulfill its burden to show a lack of such proximity.

When questioned by the prosecutor on this point, the director testified that clients "have storage boxes and hooks that [are] assigned to them."[27] They are provided access to this storage three times nightly.

He further testified that "cubbies and bins" are also provided to clients. Cubbies and bins are both "[on] the main floor" and "bigger ones [are] upstairs."[28]

This record simply does not show whether the storage areas for personal belongings—cubbies and bins—on the main floor of the shelter program lack proximity to the assigned sleeping mats located there. More importantly, since the director did not testify about Batson's specific situation, there is simply no

---

[26] Conover, 183 Wn.2d at 712.

[27] Report of Proceedings (June 17, 2014) at 112.

[28] Id.

evidence to fill this void. Thus, the State failed in its burden to show Batson lacked a "fixed residence."

The State also argues that the shelter program was not a "fixed residence" because residents could not store personal belongings in their assigned living spaces—assigned mats in this case. The State concedes that the shelter provided storage spaces for its clients. But it argues that because this storage was in a separate room, which the residents could access only three times a night, the shelter did not provide "a personally assigned living space *where a person is permitted to store belongings*."[29]

The State overlooks the fact that storage was also provided on the main floor, where the assigned sleeping mats were located, not just at another location. And it does not fill the evidentiary void regarding Batson's specific situation that we just discussed.

After determining that the shelter program is a "fixed residence" under the statute, the next question is whether sufficient evidence supports finding that Batson did not live in a "fixed residence."

Here, the State presented no direct evidence of where Batson was living during the charging period from April 19, 2013 to September 8, 2013. The State argues that the following evidence allowed the jury to infer that Batson was not living in a "fixed residence" during the charging period:

> [B]etween 2009 and 2013 [Batson] never asserted that he had a
> fixed residence; each time he provided an address it was a shelter
> for homeless persons (or a jail); the last address Batson provided to

---

[29] Brief of Respondent at 34 (emphasis added).

the sheriff's office was a homeless shelter; and Batson had filed change of address forms on several occasions—the jury could infer that he would have done so again if he had a new address.[30]

This evidence is insufficient for several reasons. First, the State conflates homelessness with lacking a "fixed residence." But as we explained earlier, the statute clearly specifies that some shelter programs are "fixed residences." Thus, whether Batson was "homeless" is immaterial. The relevant question is whether he lacked a "fixed residence." And as explained earlier, the St. Martin de Porres Shelter program qualified as a "fixed residence."

The State also argues that the jury could infer that Batson was not in a "fixed residence" because it could infer that he was not in the St. Martin de Porres Shelter.[31] Not so.

The State relies on two pieces of evidence for this inference. First, that Batson was released from Pierce County jail on April 11, 2013. Second, it relies on the shelter director's testimony that the shelter program had a waiting list. With these two pieces of evidence, the State argues that the jury could infer that Batson lost his spot at the shelter program and was unable to live there again.

This inference is purely speculative. Batson was released from jail on April 11, 2013. The charging period in this case begins on April 19, 2013, eight days later. The State did not introduce evidence about how long it would take Batson to reenter the shelter after his release. Thus, there is no reasonable

---

[30] Id. at 36-37.

[31] Id. at 35.

13

basis for the jury to infer that Batson would not have been able to reenter the shelter program during the eight day period at issue.

Moreover, it is not enough for the State to show that Batson did not reside in the St. Martin de Porres Shelter program. The State had to prove that Batson did not have any "fixed residence." If Batson resided in a different "fixed residence," he was not subject to the weekly reporting requirement. This record is simply silent on this point.

In sum, there is insufficient evidence for a jury to have found that Batson lacked a "fixed residence" during the charging period. We must reverse his conviction. Because double jeopardy prohibits the State from retrying him on this charge, we dismiss with prejudice.[32]

We reverse and dismiss.

Cox, J.

WE CONCUR:

Spearman, J.

Dwyer, J.

---

[32] State v. Fuller, 185 Wn.2d 30, 36, 367 P.3d 1057 (2016).

14