# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55329-5-II |
| Respondent, | |
| v. | |
| RANDY SMITH, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Randy Smith appeals his eleven convictions for various crimes related to a kidnapping and subsequent shootout with police. Smith argues: (1) he was denied his right to self-representation, (2) he was wrongly denied his request for appointment of new counsel, (3) the trial court abused its discretion by entering a contempt order that deprived him of his right to access the courts, (4) he was improperly restrained at his first appearance and during trial, (5) the State presented insufficient evidence to support his conviction for attempted first degree robbery, and (6) he is entitled to resentencing.

The State concedes that there was insufficient evidence to support Smith's conviction for attempted first degree robbery. We accept the State's concession. We disagree with the remainder of Smith's arguments. Accordingly, we reverse Smith's conviction for attempted first degree robbery but affirm the remainder of Smith's convictions and determine that he is not entitled to be resentenced. Thus, we remand for the trial court to vacate Smith's conviction for attempted first degree robbery.

FACTS

I. BACKGROUND

In September 2018, armed with multiple firearms and over 200 rounds of ammunition, Smith exited a bus in the early evening and approached two Parkland businesses, Best Tire Center and Sky Motors, Inc. Initially entering Best Tire, Smith threatened assistant manager Matthew Brown, as well as several other persons, with a firearm. Smith demanded Brown's car keys. Brown told Smith he did not have his keys with him but that he would go and get them. At that point, Brown fled the business with the others to a nearby gas station. Left alone, Smith then apparently searched the business but did not take anything of value.

As law enforcement was arriving, Smith left Best Tire and walked to Sky Motors with his collection of firearms and ammunition. Smith entered Sky Motors and found three teenagers and one young adult inside. While the police were taking up defensive positions outside Sky Motors, Smith threatened the occupants with one of his firearms and demanded a vehicle. One of the individuals gave Smith keys to a car. After that, three of the four young individuals managed to flee. However, the fourth person, 16-year old M.A.[1], was taken hostage by Smith. Smith then engaged in a shootout with police before eventually surrendering.

The State charged Smith with six counts of first degree assault, one count of first degree robbery, one count of attempted first degree robbery, one count of first degree kidnapping, and two counts of first degree unlawful possession of a firearm.

---

[1] We are using initials to protect the privacy of this juvenile victim.

## II. REQUEST TO PROCEED PRO SE

### A. JULY 2019 REQUEST AND JULY 29 LETTER

Prior to trial, in July 2019, Smith requested to waive his right to counsel and represent himself. At the July hearing, when the trial court asked about Smith's request, Smith answered with delusional beliefs about conspiracies and FBI informants:

> [Smith]: Well, Your Honor, from my understanding, [defense counsel] is a FBI informant. I'm trying to realize or figure out as far as a conspiracy and everything that goes on in this courtroom. I have no idea why these charges were brought against myself. I am a FBI agent. These charges are outrageous. I don't know why I'm here today. I'm asking to be released on my personal recognizance.
>
> THE COURT: Well, the reason you're here today is you've made a request to represent yourself in the case.
>
> [Smith]: Well, Your Honor, I don't dispute that. That was given by one of your agents. I'm here for a debriefing. Anything else is uncivil. I'm here for a debriefing, Your Honor.
>
> THE COURT: A debriefing of what?
>
> [Smith]: As far as this conspiracy, this romper room, Your Honor.
>
> THE COURT: I don't know what you mean.
>
> [Smith]: Huh?
>
> THE COURT: I don't know what you mean.
>
> [Smith]: From your agents. You're part of the government, right? Can you point out to me or suggest to me how do I proceed as far as the debriefing?
>
> THE COURT: Do you understand you're looking at a third strike, which would be a sentence of life in prison without the possibility of parole?
>
> [Smith]: Your Honor, I have no idea about any of this, but I have an idea as far as my involvement—
>
> THE COURT: All right.
>
> [Smith]: —in the agency.
>
> THE COURT: I'm going to deny his request to represent himself because I don't believe his request is made knowingly based upon his representations, and in a recent case, a very similar fact pattern that was decided by our Supreme Court where the defendant was talking about a conspiracy against him as opposed to indicating an unequivocal desire to represent himself.

Report of Proceedings (RP) (Jul. 11, 2019) at 3-5. The trial court then entered an order denying

Smith's request to represent himself, finding that it was not knowing or unequivocal.

On July 29, 2019, Smith sent the trial court a letter discussing his perceptions from the

prior hearing and repeating many of the delusional statements:

> Dear honorable Judge:
>
> It was a delight to start or begin the prophecy. As you are aware of the conspiracy and the co-[con]spirators Along with romper room. I will need all Local/International Information inregards of the investigation. I have made formal and informal contact with the agency. [Defense counsel] is double agent he cannot be trusted in Any regard to the conspiracy. However [the deputy prosecuting attorney] is not from our planetary system proceed with extreme caution. I have a duty/protocol to gather All important intel inregards of all unknown life forms in this sector. I have encountered several deadly life forms in this sector. "Agent Sly" And myself find this troubling. I'm A high ranking Agent authorized by the government (F.B.I.) my life as well as yours could be in danger. I need Authorization or clearance from my superior officers to fulfill the prophecies.
>
> Sincerely, Randy Smith

Clerk's Papers (CP) at 315.

B. AUGUST 2019 REQUEST

A few weeks later, Smith again requested to represent himself. On the day of the hearing

for Smith's renewed request, the State reminded the trial court that Smith had recently raised a

"rather peculiar request" to represent himself and that Smith had also made some "extraordinarily

peculiar" filings with the trial court. RP (Aug. 19, 2019) at 23.

Smith told the trial court that he "wish[ed] to exercise [his] Sixth Amendment right to self-

representation." RP (Aug. 19, 2019) at 26. The trial court asked him why, and Smith answered

that he believed he would get the best results if he proceeded pro se. The trial court asked Smith

if he had represented himself before, to which Smith replied he had not.

The trial court then engaged in a lengthy colloquy during which it asked Smith about his

knowledge of the rules of evidence, criminal procedure, and the process of admitting evidence and

making objections. Smith contended he was familiar with the rules and could reference rule books

if he was uncertain. The trial court expressed concern about the sufficiency of Smith's knowledge

of the rules.

The State opposed Smith's request for self-representation. The State noted that Smith had

shown that he did not truly understand what he was requesting. The State argued Smith's answers

should be considered in the context of the July hearing and his previous filings:

> So the jeopardy and the complexity, and that coupled with his representations now
> and in past hearings and his filings, the [S]tate would be of great concern that the
> defendant has evidenced any form of truly knowingly understanding or
> unequivocally understanding what he's asking for.
>
> I think his answers sound initially good, but would ask to synthesize or elaborate
> or how they would be applied or how they would affect his jeopardy, coupled,
> again, with his prior representations.

RP (Aug. 19, 2019) at 36-37. The trial court noted that it had read Smith's July 29 letter and

characterized it as "odd, at best." RP (Aug. 19, 2019) at 38.

After the colloquy, the trial court determined that Smith could not represent himself

because his waiver of counsel was not knowing or intelligent. In its order denying Smith's request,

the trial court specifically referenced the earlier hearing at which Smith discussed his status in the

FBI and related delusional conspiracy theories as well as the July 29 letter that repeated these

allegations:

5

> Having come on defendant's renewed & scheduled motion to represent himself, after lengthy discussion between the court, *and reference to def's pleadings filed 7/29/19 and representations @ earlier hearing, 7/11*, the court today DENIES defendant's motion, finding it is not either knowing or intelligently made.

CP at 24 (emphasis added).[2]

### III. CONFLICT BETWEEN SMITH AND DEFENSE COUNSEL

During the course of the proceedings, Smith made multiple allegations that he was being sexually harassed by defense counsel. According to Smith, defense counsel said he would not represent Smith unless Smith became his sex slave. These allegations resulted in two separate criminal investigations into defense counsel, both of which found Smith's claims to be without merit. Smith also made personal threats against defense counsel, accused him of being racist, and filed unfounded bar complaints against him.

Prior to a specific hearing in August 2019, both counsels made a "joint request" to have Smith restrained. The State explained that the request stemmed primarily from the threats of personal harm Smith had made against defense counsel. The State also noted that there were ongoing questions about Smith's mental state and that he had a history of violent crimes. Defense counsel confirmed it was a "joint request," but otherwise declined to comment. RP (Aug. 16, 2019) at 15. The trial court, after considering the statements by the parties, ordered that Smith be restrained.

---

[2] The trial court's oral comments were less specific about the reliance on the earlier hearing and submissions. The oral comments included statements that the trial court believed the waiver was neither intelligent nor knowing because, in part, Smith was facing a possible sentence of life without the possibility of release, and Smith was not familiar with the relevant legal rules.

In April 2020, as Smith continued with his allegations, defense counsel asked the trial court to remind Smith that if he continued to behave in such a manner, he could potentially forfeit his right to counsel. But defense counsel declined to take a position on how the trial court should proceed.

In response, the trial court asked Smith about "his desire with regard to counsel at [that] point." RP (Apr. 30, 2020) at 10. Smith repeated his allegations of sexual misconduct by defense counsel. The trial court responded that those allegations had been investigated and determined to be unfounded. The trial court then warned Smith that continuation of his "dilatory misconduct and tactics" could result in Smith waiving his right to counsel. RP (Apr. 30, 2020) at 15.

Smith requested that he be provided with a different defense counsel. The trial court denied the request. However, the trial court issued an order barring Smith from continuing with his "dilatory misconduct and tactics, which include[] false accusations of misconduct and threats . . . against [defense counsel]." CP at 69. The trial court also ordered that defense counsel have a third person present at all future meetings and interactions with Smith (the defense investigator was ultimately selected). Defense counsel did not comment on the trial court's rulings. But Smith asked the trial court if he could appeal the trial court's decisions, to which the trial court replied, "I am doing nothing to interfere with your appellate rights." RP (Apr. 30, 2020) at 26.

Smith subsequently attempted to appeal the trial court's refusal to appoint new counsel, stating in his notice of appeal that: (1) defense counsel had sexually harassed Smith, (2) there was a conflict between defense counsel and Smith, and (3) defense counsel had a conflict of interest. Upon learning of Smith's appeal, defense counsel filed a motion for the trial court to reconsider

whether Smith had waived his right to counsel, stating that Smith had repeated his prior allegations of sexual misconduct against defense counsel in his appeal.

At the hearing on defense counsel's motion, Smith stated that he had simply wanted the Court of to review the trial court's decision denying him a new counsel. The State responded that because Smith was facing a sentence of life without the possibility of release, his repeated sexual misconduct allegations against defense counsel were likely an "attempt[] [at] different avenues to try to basically put off what . . . is probably going to be the inevitable." RP (Sept. 11, 2020) at 77. The State recommended that the trial court, instead of removing defense counsel, find Smith in contempt for his continued allegations against defense counsel. Apart from drawing the trial court's attention to Smith's actions, defense counsel took no position on how the trial court should proceed.

The trial court agreed with the State, finding Smith in contempt of the April order "by his filing of the notice of appeal to Court of Appeals that contained the same allegations that he had been previously making against [defense counsel]." RP (Sept. 11, 2020) at 79. The trial court's contempt order provided that to purge the contempt, Smith "shall abstain from writing or making allegations against [defense counsel] directed to any judicial or similar entity, if def. fails, the court will consider curtailing his [Pierce County Jail] privileges." CP at 84.

## IV. USE OF RESTRAINTS

At Smith's first appearance following his arrest, in September 2018, he appeared in restraints. The record does not show that the trial court made an individualized assessment of whether restraints were required. During the hearing, the trial court found that there was probable cause for the arrest, accepted Smith's not guilty plea, and set financial release conditions at $2.5

million. Smith's counsel made no argument about financial conditions, reserving argument for a later date.

About two years later at the outset of the trial, Smith apparently requested that he be restrained to some degree because he feared that he might harm others. He appeared in handcuffs and belly chains. Seeing his client in restraints, defense counsel asked Smith to change his mind and agree to appear without restraints. Smith agreed, and a discussion ensued among the trial court, the State, defense counsel, and corrections staff to determine if the request would be accommodated. The State and corrections staff both recommended that some form of restraints continue to be used given the threats made by Smith and the potential security risks. Both the State and corrections staff requested the trial court use a device referred to as the "Band-It," which was a stun device that could be hidden under Smith's clothing and affixed to his leg and would not generally impede Smith's ability to move around. Defense counsel objected, stating he had never felt unsafe in Smith's presence, but he also understood that his safety was not the trial court's only concern.

The trial court gave a lengthy oral decision. The trial court started by saying it generally deferred to security experts in these matters. It found that there had been a "difficult and acrimonious relationship" between the defense counsel and Smith. RP (Nov. 12, 2020) at 864. Smith himself had requested to be restrained out of concern that he would harm defense counsel. Citing case law,[3] the trial court noted that this sort of threat should be taken seriously but that it

---

[3] The trial court stated it was using as its frame of reference "the case of *State v. Lundstrom*," RP (Nov. 12, 2020) at 870 (referring to *State v. Lundstrom*, 6 Wn. App. 2d 388, 393-95, 429 P.3d 1116 (2018), which discusses the process for consideration of restraints).

was also necessary to balance security interests against Smith's rights. The trial court determined that the use of the Band-It was the best option because it would protect the security interests but would not be visible to the jury and would not impede Smith from moving about. Finally, the trial court said that although it was highly deferential to corrections staff regarding security issues, "that deference does not extend to superseding my discretion and my role as trial judge in balancing what I think is appropriate here." RP (Nov. 12, 2020) at 871. Accordingly, the Band-It was used to restrain Smith during trial.

## V. Trial and Sentencing

The case proceeded as a jury trial in November 2020. In support of its charge for attempted first degree robbery, the State presented testimony showing that Smith had unsuccessfully attempted to take property from Matthew Brown when he was at Best Tire. The State did not present evidence that Smith actually took property from Brown.

During the discussion with the trial court regarding jury instructions, the State proposed the following instruction for the attempted first degree robbery charge:

> [T]o convict the defendant of the crime of Attempted Robbery in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about September 6, 2018, the defendant did an act that was a substantial step toward the commission of Robbery in the First Degree;
>
> (2) That the act was done with the intent to commit Robbery in the First Degree;
>
> (3) Robbery in the First Degree is proved when each of the following elements is proved beyond a reasonable doubt:
>
> (4) That on September 6, 2018 *the defendant unlawfully took personal property from Matt Brown or in the presence of another*,
>
> (5) The defendant intended to commit theft of the property;

10

(6)   That the taking was against the person's will by the defendant's use or threatened use of immediate force, violence, or fear of injury to that person or to the person of another;

(7)   That the force or fear was used by the defendant to obtain or retain possession of the property or to prevent or overcome resistance to the taking;

(8)   That in the commission of these acts or in the immediate flight therefrom the defendant was armed with a deadly weapon; and

(9)   That any of these acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 138 (emphasis added).  Thus, the instruction combined the elements for the attempted crime as well as the completed crime of first degree robbery.  The trial court adopted the instruction and instructed the jury accordingly.

The jury found Smith not guilty on all first degree assault charges but found him guilty on each of the lesser-included second degree assault charges and found him guilty of the remainder of the charges including attempted first degree robbery.

Based on Smith's criminal history, including a prior conviction for second degree robbery with a deadly weapon enhancement, the trial court found that Smith qualified as a persistent offender under Washington's Persistent Offender Accountability Act, chapter 9.94A RCW.  As a result, the trial court sentenced Smith to life in prison without the possibility of release.

Smith appeals.

ANALYSIS

I. RIGHT TO SELF-REPRESENTATION

Smith contends that the trial court erred in denying him his right to self-representation. We disagree.

A. LEGAL PRINCIPLES

The Washington Constitution provides criminal defendants with an explicit right to self-representation. Wash. Const. art. I, § 22. The Sixth Amendment to the United States Constitution also implicitly provides for this right. *Faretta v. California*, 422 U.S. 806, 820 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). "This right is so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). Moreover, in Washington, " '[t]he unjustified denial of this [pro se] right *requires* reversal.' " *Id.* (some alterations in original) (quoting *State v. Stenson*, 132 Wn.2d 668, 737, 940 P.2d 1239 (1997)).

When asserted, a trial court must determine whether a defendant's request for self-representation is voluntary, knowing, and intelligent. *Id.* at 504. This determination is usually accomplished with a colloquy. *Id.* That colloquy should at the least notify the defendant of: (1) the nature and classification of charges brought, (2) maximum penalties if the defendant is convicted, and (3) technical legal rules the defendant will need to follow. *City of Bellevue v. Acrey*, 103 Wn.2d 203, 211, 691 P.2d 957 (1984). In making the determination of whether to allow a defendant to proceed with self-representation, a trial court must indulge " 'every reasonable presumption' against a defendant's waiver of [their] right to counsel." *Madsen*, 168 Wn.2d at 504 (quoting *In re Det. of Turay*, 139 Wn.2d 379, 396, 986 P.2d 790 (1999)).

A defendant does not have an absolute right to self-representation, and a trial court may deny a defendant their right to self-representation in certain circumstances. *Id.* "The grounds that allow a court to deny a defendant the right to self-representation are limited to a finding that the defendant's request is equivocal, untimely, involuntary, or made without a general understanding of the consequences." *Id.* at 504-05. This finding must be based on an "identifiable fact." *Id.* at 505.

The defendant's " 'skill and judgment' " is not a relevant consideration in this determination. *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 663, 260 P.3d 874 (2011) (internal quotation marks omitted) (quoting *State v. Hahn*, 106 Wn.2d 885, 890 n.2, 726 P.2d 25 (1986)). "A trial court may not deny a motion for self-representation based on grounds that it would be 'detrimental to the defendant's ability to present his case' or concerns that proceedings would be less efficient and orderly." *State v. Englund*, 186 Wn. App. 444, 458, 345 P.3d 859 (quoting *Madsen*, 168 Wn.2d at 505), *review denied*, 183 Wn.2d 1011 (2015). Furthermore, "unfamiliar[ity] with legal rules" is not justification for denying a defendant's right to self-representation. *Madsen*, 168 Wn.2d at 509.

However, a determination that a defendant is not mentally competent to represent themselves is a proper ground for denying a request for self-representation. *Rhome*, 172 Wn.2d at 659-60. "Self-representation undercuts the right to a fair trial when the defendant's lack of capacity to conduct a defense threatens an improper conviction." *Englund*, 186 Wn. App. at 457. Thus, a trial court may deny a defendant their right to self-representation if it determines that the defendant " 'lacks the mental capacity to conduct [their] defense.' " *Rhome*, 172 Wn.2d at 660 (quoting *Indiana v. Edwards*, 554 U.S. 164, 176, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008)).

Considerations of mental capacity "are integral to a knowing and intelligent waiver." *Rhome*, 172 Wn.2d at 665 (citing *Edwards*, 554 U.S. 164).

Appellate courts review decisions of waiver of the right to counsel for abuse of discretion. *State v. Coley*, 180 Wn.2d 543, 559, 326 P.3d 702 (2014), *cert. denied*, 574 U.S. 1174 (2015). Waiver of counsel is an "ad hoc," fact specific analysis best suited for trial courts. *Id.* " 'A court abuses its discretion when an order is manifestly unreasonable or based on untenable grounds.' " *Rhome*, 172 Wn.2d at 668 (internal quotation marks omitted) (quoting *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009)). Discretionary decisions of a court are based on untenable grounds if they rely on facts not supported in the recorded or are based on the wrong legal standard. *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009). A court abuses its discretion where it makes a ruling based on a flawed interpretation of the law. *Id.*

Generally on appeal, the trial court's written decisions are controlling. *Grieco v. Wilson*, 144 Wn. App. 865, 872, 184 P.3d 668 (2008) ("[I]f the oral decision conflicts with the written decision, the written decision controls."), *aff'd*, 168 Wn.2d 335, 227 P.3d 1284 (2010).

B.  APPLICATION

Smith maintains that the trial court abused its discretion in denying his request for self-representation at the August 2019 hearing. We disagree.

Smith clearly demonstrated a lack of mental capacity to conduct a defense at the July 2019 hearing where the trial court initially denied his request for self-representation. When asked why he wanted to represent himself, Smith gave delusional answers, stating that he was an FBI agent

and his defense lawyer was an FBI informant. He told the trial court he was there "for a debriefing" on "this conspiracy, this romper room" from the trial court's "agents."[4] RP (Jul. 11, 2019) at 3-5.

Smith failed to understand, or even respond to, any of the trial court's questions regarding his case, his desire to represent himself, or the sentence he was facing. A few weeks later, in his July 29 letter, Smith repeated his delusional statements about the FBI. He also made statements about "fulfill[ing] the prophecies" and "unknown life forms in this sector," along with an allegation that the deputy prosecuting attorney was "not from our planetary system." CP at 315.

Although Smith did not overtly express delusional ideas a few weeks later at the August 2019 hearing, the State pointed out that Smith's answers needed to be considered in context and "coupled with" the answers given in the July hearing and the July 29 letter. RP (Aug. 19, 2019) at 36-37. In the end, the trial court explicitly based its order, at least in part, on these earlier interactions that had occurred only a few weeks earlier. The trial court's written order correctly found that Smith's waiver was neither knowing nor intelligent at the August 2019 hearing by referencing these earlier events. Throughout this time period, Smith had demonstrated that he

---

[4] Smith's mental condition was an ongoing issue during proceedings. In December 2018, the Department of Assigned Counsel (DAC) sought, and obtained, an expert to evaluate Smith's mental condition. And in June 2019, Smith filed two pro se requests for a mental examination, stating that "[t]he defendant Randy Smith suffers from a long standing 'mental illness' that requires a competency hearing at Western State Hospital in the interest of justice." CP at 310-11 (some capitalization altered). (The record before this court does not contain the resulting report of Smith's mental evaluation requested by DAC. However, the trial court did send a letter to Smith in response to his June 2019 pleadings informing him that the trial court "does not act on ex-parte letters or improperly filed pleadings." CP at 314.).

lacked capacity to conduct his own defense, and the trial court's written order reflected these considerations.[5]

Especially in cases like this, where a defendant's capacity to represent themselves depends upon an evaluation of mental capabilities, we give deference to the trial court's finding because it had the opportunity to observe Smith's demeanor and non-verbal conduct along with his verbal responses during the colloquy. Indulging every reasonable presumption against Smith's waiver of his right to counsel and in light of the deference given to trial courts on these matters, the record supports the trial court's determination. Accordingly, we determine that the trial court did not abuse its discretion in denying Smith his right to self-representation.

## II. RIGHT TO CONFLICT-FREE COUNSEL

### A. LEGAL PRINCIPLES

The Sixth Amendment right to counsel includes a right to counsel that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); *State v. Dhaliwal*, 150 Wn.2d 559, 566, 79 P.3d 432 (2003). "A conflict of interest exists when a defense attorney owes duties to a party whose interests are adverse to those of the defendant in the context of a particular representation." *State v. Fualaau*, 155 Wn. App. 347, 362, 228 P.3d 771, *review denied*, 169 Wn.2d 1023 (2010), *cert. denied*, 563 U.S. 905 (2011).

---

[5] Smith argues that the trial court's oral comments show that the trial court wrongfully based its decision on grounds that self-representation would be detrimental to Smith's case or because of Smith's lack of familiarity with legal rules. Although the trial court noted in its oral comments that Smith should be represented by a lawyer given the fact that he was facing a long sentence and that he lacked legal knowledge, those comments are more logically understood as the trial court's observation of practical realities rather than as the ultimate basis for the trial court's written decision.

The burden is on the defendant to demonstrate that an actual conflict of interest adversely affected the defense attorney's performance. *Id.* Indeed, even where a defendant "has demonstrated the possibility that his attorney was representing conflicting interests," the defendant "fail[s] to establish an actual conflict" where there is no showing how the conflict impacted defense counsel's performance at trial. *Dhaliwal*, 150 Wn.2d at 573. A defendant is not required to show that the outcome of the trial would have been different but for the conflict. *Fualaau*, 155 Wn. App. at 362. However, the defendant must establish that " 'some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' " *Id.* (internal quotation marks omitted) (quoting *State v. Regan*, 143 Wn. App. 419, 428, 177 P.3d 783 (2008)).

" 'Substitution of counsel is an instrument designed to remedy meaningful impairments to effective representation, not to reward truculence with delay.' " *Id.* at 359 (quoting *People v. Linares*, 2 N.Y.3d 507, 512, 780 N.Y.S.2d 529, 813 N.E.2d 609 (2004)). Washington courts have "refused to recognize a rule of law that would empower criminal defendants to inject reversible error into their trials by threatening their lawyers:

> "We rely in the first instance on our trial courts to determine whether a criminal defendant is represented by an attorney truly laboring under conflicting interests or whether the defendant has simply engineered an apparent conflict in an attempt to delay the ultimate moment of truth, the jury's verdict.' "

*Id.* at 359-60 (quoting *People v. Roldan*, 35 Cal. 4th 646, 675, 27 Cal. Rptr. 3d 360, 110 P.3d 289 (2005)). "A defendant's misconduct toward his attorney does not necessarily create a conflict of

17

interest." *Id.* at 360. Absent an actual conflict of interest that results in an adverse impact on defense counsel's performance, a defendant is not entitled to a new attorney. *Id.*

A trial court must have sufficient discretion to determine the appropriate course of conduct when a defendant misbehaves in a courtroom. *Id.* " 'No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.' " *Id.* at 361 (quoting *Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)).

> Hence, even where the defendant's misconduct causes a conflict of interest with defense counsel, the trial court is not necessarily required to grant the attorney's motion to withdraw, thus necessitating the substitution of new counsel. Rather, depending upon the circumstances extant, the trial court may require the defendant to proceed pro se or may require the attorney to continue representing the defendant. The trial court is in the best position to consider the appropriate options.

*Id.* at 361.

B. APPLICATION

Smith argues that the trial court denied him his right to conflict-free counsel when it denied his request for appointment of a new attorney. He claims that, as a result of a conflict of interest, his attorney generally failed to act in Smith's best interest. We disagree.

Smith offers several reasons why the trial court erred in denying his request for appointment of a new attorney. Smith contends that defense counsel's efforts to undermine Smith's right to counsel show that there was an actual conflict between him and defense counsel. Smith maintains that when defense counsel participated in a "joint request" in August 2019 that Smith be restrained, a conflict was created. Additionally, Smith argues that the trial court interfered with the attorney-client relationship by requiring a third person be present at all attorney-client meetings and defense counsel's failure to object created a conflict. Finally, Smith argues

that defense counsel acquiesced to the State's request to find Smith in contempt and that also created a conflict.

Smith fails to meet his burden. A defendant claiming that his right to conflict-free counsel has been violated has the burden of demonstrating that the conflict of interest adversely affected the defense attorney's performance. *See Fualaau*, 155 Wn. App. at 362. Although Smith argues broadly that a conflict existed and that, as a result, defense counsel failed to adequately represent him, he does not explain how he believes this specifically impacted defense counsel's representation. Smith does not point to any " 'plausible alternative defense strategy or tactic [that] might have been pursued but was not.' " *Id.* (internal quotation marks omitted) (quoting *Regan*, 143 Wn. App. at 428).

In fact, reviewing the record as a whole, defense counsel persisted throughout the proceedings in zealously advocating for Smith despite Smith's constant barrage of accusations, threats, and additional misbehavior. On multiple occasions, in an effort to ensure he would be able to continue advocating for Smith, defense counsel requested the trial court warn Smith that his misbehavior could result in him forfeiting his right to counsel. Contrary to Smith's general claim that defense counsel did not act in his best interests, defense counsel continued to demonstrate impressive professionalism during his representation of Smith. Moreover, the requirement that a third party be present during attorney-client meetings did not interfere with attorney-client privilege because the third party was the defense investigator. *See Broyles v. Thurston County*, 147 Wn. App. 409, 442, 195 P.3d 985 (2008) ("Under the 'common interest' rule, 'communications exchanged between multiple parties engaged in a common defense remain

privileged under the attorney-client privilege.' ") (quoting *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 716, 985 P.2d 262 (1999)).

Accordingly, we determine that the trial court did not err in denying Smith's request for an appointment of a new attorney due to a conflict of interest.

### III. RIGHT TO COURT ACCESS

#### A. LEGAL PRINCIPLES

Incarcerated individuals have a due process constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996); *Whitney v. Buckner*, 107 Wn.2d 861, 865, 734 P.2d 485 (1987). However, this right is not absolute and may be limited with reasonable restrictions. *In re Marriage of Giordano*, 57 Wn. App. 74, 77, 787 P.2d 51 (1990). "Every court of justice has power . . . . [t]o provide for the orderly conduct of proceedings before it." RCW 2.28.010(3). Courts are authorized "to control the conduct of litigants who impede the orderly conduct of proceedings." *Yurtis v. Phipps*, 143 Wn. App. 680, 693, 181 P.3d 849, *review denied*, 164 Wn.2d 1037 (2008). "[A] court may, in its discretion, place reasonable restrictions on any litigant who abuses the judicial process." *Id.*

Trial courts may enjoin a party from litigation if there is a " 'specific and detailed showing of a pattern of abusive and frivolous litigation.' " *Id.* (quoting *Whatcom County v. Kane*, 31 Wn. App. 250, 253, 640 P.2d 1075 (1981)). "Proof of mere litigiousness is insufficient to warrant limiting a party's access to the court." *Bay v. Jensen*, 147 Wn. App. 641, 657, 196 P.3d 753 (2008). When a trial court issues an injunction it " 'must be careful not to issue a more comprehensive injunction than is necessary to remedy proven abuses, and if appropriate the court should consider

less drastic remedies.' " *Yurtis*, 143 Wn. App. at 693 (quoting *Whatcom County*, 31 Wn. App. at 253).

"A court's authority to impose sanctions for contempt is a question of law, which we review de novo." *In re the Interest of Silva*, 166 Wn.2d 133, 140, 206 P.3d 1240 (2009). We review a trial court's finding of contempt for a clear showing of abuse of discretion. *State v. Dennington*, 12 Wn. App. 2d 845, 851, 460 P.3d 643, *review denied*, 196 Wn.2d 1003 (2020). "An abuse of discretion occurs when a trial court exercises its discretion in an unreasonable manner or bases it on untenable grounds or reasons." *Id.*

A trial court has both statutory and inherent authority to impose sanctions for contempt. *State v. Hobble*, 126 Wn.2d 283, 292, 892 P.2d 85 (1995). "Contempt of court" includes intentional "[d]isobedience of any lawful judgment, decree, order, or process of the court." RCW 7.21.010. The remedy where a trial court improperly exercises its contempt power is a vacation of the contempt orders entered as a result. *State v. Salazar*, 170 Wn. App. 486, 493, 291 P.3d 255 (2012).

When a trial court imposes a civil contempt order,[6] the "contempt order must contain a purge condition allowing the contemnor to purge the sanction through an affirmative act." *In re*

---

[6] Here, the trial court's contempt order did not state whether it was an order purportedly issued under its authority for civil contempt or criminal contempt, and neither party has briefed this issue. However, given that the contempt order was intended to coerce Smith into complying with the court order barring Smith's ongoing abuse of his defense counsel, we construe the trial court's order as civil contempt. *See In re the PRP of King v. Dep't of Soc. & Health Servs.*, 110 Wn.2d 793, 799-800, 756 P.2d 1303 (1988) (the purpose of civil contempt is to coerce compliance with a court order; the purpose of criminal contempt is punitive with no opportunity for the contemnor to purge the contempt).

*Det. of Faga*, 8 Wn. App. 2d 896, 900, 437 P.3d 741 (2019). "The contemnor must have the ability to satisfy the purge condition." *Id.* at 900-01.

B. APPLICATION

Smith argues that the trial court improperly penalized him for exercising his right to access the courts to seek judicial redress. Smith asserts that the trial court's order finding him in contempt was error because it chilled his "ability to exercise his fundamental rights and to seek redress through the courts" and "undermined the fairness of the proceedings." Br. of Appellant at 57. We agree that the trial court erred in its contempt order, but Smith fails to show prejudice and, in any event, the issue is moot.

After multiple accusations of sexual misconduct against defense counsel, resulting in two separate criminal investigations (both concluding the accusations were meritless), the trial court ordered Smith not to repeat his false allegations again. Smith attempted to appeal the trial court's order and repeated the same allegations about defense counsel. Determining that Smith's repetition of the same false allegations constituted a violation of its order, the trial court found Smith in contempt and ordered that to purge the contempt, Smith "shall abstain from writing or making allegations against [defense counsel] directed to any judicial or similar entity, if def. fails, the court will consider curtailing his [Pierce County Jail] privileges." CP at 84.

Smith argues that the trial court's order violated his right of access to the courts as a criminal defendant because he was not permitted to include in his appeal his accusations against his counsel. We agree that the contempt order chilled Smith's access to the courts and the record does not show that the trial court actively considered "less drastic remedies" before it inhibited Smith's access to the courts. In addition, the contempt order imposed an unworkable purge

condition, that is, the contempt could be purged only by *forgoing* future conduct indefinitely—refraining from making allegations against Smith's defense counsel for an indefinite period of time. No explanation has been offered as to how this comports with the law requiring that a contemnor have the ability to purge the contempt with an *affirmative* act. *See Faga*, 8 Wn. App. 2d at 900-01. We appreciate the challenges faced by the trial court as it attempted to manage Smith's abusive behavior toward defense counsel, but it abused its discretion in fashioning this contempt order.

Notwithstanding this error, Smith has failed to show how the trial court's order prejudiced him. Although Smith argues that the order "chilled [his] constitutional right to access the courts, to petition, and to appeal," Smith fails to identify any action he would have taken absent the order that would have had any bearing on his case. Br. of Appellant at 56. Moreover, the record is devoid of any practical consequences to Smith's conviction caused by his inability to persist in meritless accusations against his counsel.

Ultimately, without Smith demonstrating prejudice during the course of the trial, the issue is moot. Smith argues that the remedy here should be reversal of each of his convictions but has cited no case law supporting this remedy. *State v. Young*, 89 Wn.2d 613, 625, 574 P.2d 1171 (" 'Where no authorities are cited in support of a proposition, the court . . . may assume that counsel, after diligent search, has found none.' ") (quoting *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)), *cert. denied*, 439 U.S. 870 (1978). The more appropriate remedy in this context for the abuse of discretion would be reversal of the order. But with the ending of this case through his conviction, Smith fails to show this order has any continuing effect, meaning no order from this court could provide any relief. *Spokane Research*

*& Def. Fund v. City of Spokane*, 155 Wn.2d 89, 99, 117 P.3d 1117 (2005) ("A case is moot when

. . . a court can no longer provide effective relief.").

Although the trial court erred in its contempt order, Smith has failed to show how he has

been prejudiced by the order and, moreover, the issue is moot. Accordingly, we determine that

Smith's arguments fail.

## IV.  USE OF RESTRAINTS

### A.  LEGAL PRINCIPLES

A defendant is entitled to be free of physical restraints in the presence of the court. *State*

*v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). The restraint of a defendant may affect their

constitutional right to a presumption of innocence, the right to testify, and the right to confer with

defense counsel during trial. *State v. Damon*, 144 Wn.2d 686, 691, 25 P.3d 418 (2001).

Additionally, "keeping the defendant in restraints during trial may deprive him of the full use of

all his faculties." *Id.* For these reasons, the use of physical restraints should be used as measures

of " 'last resort' " and courts must consider less restrictive alternatives before imposing restraints.

*State v. Finch*, 137 Wn.2d 792, 850, 975 P.2d 967 (quoting *Allen*, 397 U.S. at 344), *cert. denied*,

528 U.S. 922 (1999).

Trial courts have broad discretion to determine what security measures are necessary to

ensure the safety of occupants of the court and maintain decorum. *Damon*, 144 Wn.2d at 691.

Trial courts may consider the following factors in deciding whether use of restraints is justified:

> "[T]he seriousness of the present charge against the defendant; defendant's
> temperament and character; his age and physical attributes; his past record; past
> escapes or attempted escapes, and evidence of a present plan to escape; threats to
> harm others or cause a disturbance; self-destructive tendencies; the risk of mob
> violence or of attempted revenge by others; the possibility of rescue by other

offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

*Id.* (alteration in original) (internal quotation marks omitted) (quoting *Finch*, 137 Wn.2d at 848); *see also State v. Lundstrom*, 6 Wn. App. 2d 388, 393-95, 429 P.3d 1116 (2018), *review denied*, 193 Wn.2d 1007 (2019). However, restraints must " 'be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent escape.' " *Damon*, 144 Wn.2d at 691 (quoting *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)). Additionally, restraints should be used only after the trial court has conducted an individualized inquiry through a hearing and entered findings on the record that sufficiently justify their use with the particular defendant. *Id.* at 691-92; *Jackson*, 195 Wn.2d at 854.

Where the trial court has improperly restrained a defendant, the State bears the burden of proving beyond a reasonable doubt that the error was harmless. *Jackson*, 195 Wn.2d at 856.

[T]he test for harmless error is whether the state has over-come the presumption of prejudice when a constitutional right of the defendant is violated when, from an examination of the record, it appears the error was harmless beyond a reasonable doubt, or whether the evidence against the defendant is so overwhelming that no rational conclusion other than guilt can be reached.

*Id.* at 855 (quoting *State v. Clark*, 143 Wn.2d 731, 775-76, 24 P.3d 1006 (2001)).

We review the trial court's decision to restrain the defendant for an abuse of discretion. *Damon*, 144 Wn.2d at 692. The trial court abuses its discretion when it bases a decision to restrain a defendant solely on concerns expressed by a correctional officer. *Id.* A trial court also abuses its discretion when it fails to analyze issues under applicable law. *Jackson*, 195 Wn.2d at 855.

B.  APPLICATION

Smith focuses on two specific instances to argue that the trial court deprived him of his right to appear free of physical restraints: first, at his initial appearance and, second, during trial. For Smith's first appearance, we agree that the trial court abused its discretion by failing to conduct an individualized hearing but determine that the State has shown that the error was harmless beyond a reasonable doubt. For the restraints used during trial, we determine that the trial court did not abuse its discretion.

1.  Initial Appearance

Smith argues that the trial court erred in using restraints during his initial appearance. The State concedes that the application of restraints was improper but maintains that any error in the use of restraints was harmless beyond a reasonable doubt because the trial court's decisions during Smith's initial appearance were reasonable. We agree with the State and determine that the use of restraints was harmless beyond a reasonable doubt.

At the initial appearance, the trial court found probable cause for the arrest, accepted Smith's not guilty plea, and set financial release conditions at $2.5 million. The State has demonstrated that the use of restraints was harmless error for four reasons. First, the trial court's determination of probable cause was reasonable. The trial court relied on the prosecutor's written declaration in its finding of probable cause. This declaration established that Smith had robbed and attempted to rob two separate stores and had taken a hostage before engaging in a shootout with police. This was more than sufficient to support the trial court's finding of probable cause for the arrest. *See State v. Parks*, 136 Wn. App. 232, 237, 148 P.3d 1098 (2006) ("Probable cause

for arrest as it is normally understood is defined in terms of circumstances sufficient to warrant a prudent person in believing that the suspect had committed or was committing a crime.").

Second, as the State points out, Smith's entry of not guilty pleas on all counts suggests that Smith was able to make decisions freely and did not feel condemned solely by his restraints.

Third, given the gravity of the crimes that Smith was charged with and that he was facing a mandatory life sentence without the possibility of release if convicted, the trial court's setting of high financial release conditions was reasonable. Further, defense counsel made no argument regarding the appropriate level of financial conditions, stating that it intended to reserve arguments regarding release conditions for a later date.

Fourth, and finally, because the first appearance was a short proceeding that occurred more than two years prior to Smith's trial and the hearing did not involve a jury or any trier of fact that would decide the ultimate question of Smith's guilt or innocence, the impact of Smith appearing in restraints was minimized.

For all of the above reasons, we determine that the State has demonstrated that any error in the use of restraints at Smith's first appearance was harmless beyond a reasonable doubt.

2. Trial

Smith also argues that the trial court abused its discretion in allowing the use of the restraint device, called the Band-It, during his trial because it did not engage in an individualized inquiry and did not consider less-restrictive alternatives. We disagree.

The trial court, after careful deliberation and discussion with all parties, cited to the *Lundstrom* case and made a lengthy individualized determination that the use of the Band-It was necessary. In making its decision, the trial court referenced the threats Smith had made to defense

27

counsel and the potential security issues involved in this particular case. The trial court also considered the opinions of the State, defense counsel, and corrections staff. It noted that the use of the Band-It would allow Smith to visually appear free of restraints while protecting against potential security issues. Although the trial court stated that it was significantly deferring to the opinion of correctional staff in making the decision on restraints, it also explicitly stated that this deference was not an abdication of its discretion, and ultimately, it was making the decision based on a balancing of the various interests. Moreover, the fact that Smith had previously requested to be restrained because he feared he could not control himself supported the trial court's decision to continue to restrain Smith.

Smith also argues that the trial court failed to consider less-restrictive alternatives, like metal detectors. This argument ignores the security risks flowing from Smith's past behavior and the fact that the Band-It was, in some ways, a less-restrictive alternative than the more visually obvious and constraining handcuffs and belly chains. The record demonstrates that no one in the courtroom was able to see the Band-It when Smith was wearing it and that its use did not impede Smith from moving about. The trial court determined that the use was necessary only after consulting with all the parties, carefully deliberating, and weighing the appropriate factors.

Accordingly, given the broad discretion given to trial courts on courtroom security issues, we determine that the trial court did not abuse its discretion in ordering Smith be restrained during trial.

V.  SUFFICIENCY OF EVIDENCE

Smith argues that the State presented insufficient evidence to support Smith's conviction for attempted first degree robbery.  The State concedes that the evidence for Smith's conviction was insufficient.  We accept the State's concession.

A.  LEGAL PRINCIPLES

The State has the burden of proving every element of each charged offense beyond a reasonable doubt under the state and federal constitutions.  *State v. Johnson*, 188 Wn.2d 742, 750, 399 P.3d 507 (2017).  In reviewing a claim for insufficient evidence, we consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  *Id.* at 751 (internal quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)).

Under Washington's law of the case doctrine, " 'jury instructions that are not objected to are treated as the properly applicable law for the purposes of appeal.' "  *Id.* at 755 (quoting *Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005)).  Thus, in addition to proving all of the statutory elements of the charged offense, the State must also prove all of the elements included in the to-convict instruction.  *Id.* at 755-56.  Where we determine that the State has presented insufficient evidence to support a conviction, double jeopardy attaches.  *State v. Fuller*, 185 Wn.2d 30, 36, 367 P.3d 1057, 1060 (2016).  In such a case, we reverse the conviction and dismiss the charge with prejudice.  *See, e.g., State v. Batson*, 194 Wn. App. 326, 339, 377 P.3d 238 (2016) (citing *Fuller*, 185 Wn.2d at 36).

B. APPLICATION

Smith argues that there was insufficient evidence to support his conviction for attempted first degree robbery. We agree.

The jury instruction for attempted first degree robbery in this case required that the jury must find that Smith "unlawfully took personal property from Matt Brown . . . ." CP at 138. As the State admits, it did not present evidence that Smith took property from Brown. Rather, it presented evidence that he *attempted* to take property from Brown. Because no evidence was presented that Smith took property from Brown, no rational trier of fact could have found that he had. Thus, under the law of the case doctrine, we determine that the State presented insufficient evidence to support the attempted first degree robbery charge. Accordingly, we accept the State's concession and order that the attempted first degree robbery charge be vacated and dismissed with prejudice.

VI. SENTENCING

Smith argues that a change in Washington law which removed second degree robbery from the list of strike-eligible offenses entitles him to resentencing. We disagree.

A. LEGAL PRINCIPLES

In Washington, an individual who has been convicted of three or more "most serious offenses" is considered a "persistent offender" under Washington's Persistent Offender Accountability Act and is sentenced to life in prison without the possibility of release.[7] RCW 9.94A.030(37); RCW 9.94A.570. In 2019, the legislature changed the definition of "most serious

---

[7] For some crimes, not relevant to this case, conviction of two or more offenses results in a sentence of mandatory life without the possibility of release.

offense" to remove second degree robbery from the list of included offenses.[8]  *Cf.* former RCW

9.94A.030(33)(o) (2019), *with* former RCW 9.94A.030(32) (2020).

After Smith was sentenced, the Persistent Offender Act was amended again in 2021 to

provide that offenders affected by the removal of second degree robbery as a serious offense were

entitled to resentencing,

> In any criminal case wherein an offender has been sentenced as a persistent offender, the offender must have a resentencing hearing if a current or past conviction for robbery in the second degree was used as a basis for the finding that the offender was a persistent offender.

RCW 9.94A.647(1).  However, in making these amendments, the legislature chose to leave "[a]ny

. . . felony with a deadly weapon verdict" on the list of most serious offenses.  RCW

9.94A.030(32)(s).

When interpreting a statute, courts should construe its meaning by reading the statute in its

entirety and considering its relation with other statutes.  *Dep't of Ecology v. Campbell & Gwinn,*

*L.L.C.*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002).  "The construction . . . shall be made with the

assumption that the Legislature does not intend to create inconsistency.  Statutes are to be read

together, whenever possible, to achieve a 'harmonious total statutory scheme . . . which maintains

the integrity of the respective statutes.' "  *State ex rel Peninsula Neighborhood Ass'n v. Dep't of*

*Transp.*, 142 Wn.2d 328, 342, 12 P.3d 134 (2000) (second alteration in original) (citation omitted)

(internal quotation marks omitted) (quoting *Employco Personnel Servs., Inc. v. City of Seattle*, 117

Wn.2d 606, 614, 817 P.2d 1373 (1991).  "Where there are two reasonable interpretations of

statutory language, the interpretation which better advances the overall legislative purpose should

---

[8] ENGROSSED SUBSTITUTE S.B. 5288, 66th Leg., Reg. Sess. (Wash. 2019).

be adopted[.]" *Weyerhaeuser Co. v. Dep't of Ecology*, 86 Wn.2d 310, 321, 545 P.2d 5 (1976).

"The court must also avoid constructions that yield unlikely, absurd or strained consequences."

*Kilian v. Atkinson*, 147 Wn.2d 16, 21, 50 P.3d 638 (2002).

B. APPLICATION

The trial court sentenced Smith as a persistent offender by relying in part on Smith's second degree robbery conviction with a deadly weapon enhancement. Smith argues that because the trial court relied on a second degree robbery conviction, regardless of the fact that it contained a deadly weapon enhancement, Washington law requires that he be resentenced.

Although second degree robbery, by itself, is no longer a most serious offense, second degree robbery with a deadly weapon enhancement remains so. From the face of the enactment, the legislature intended to remove second degree robbery, a crime that can involve relatively minor criminal intent,[9] from the most serious offenses but leave *all felonies* with weapon enhancements as most serious offenses. Simply put, Smith was convicted of a crime that clearly remains a most serious offense.

To read RCW 9.94A.647(1) as Smith urges would be contrary to the intent of the legislature and lead to the absurd result of unnecessary resentencings. The trial court would be forced into the mechanical exercise of simply recognizing the most serious offense is now labeled a "felony

---

[9] During the legislative process, public testimony in support of the amendment to the law included testimony that "[second degree robbery] is usually a shoplifting-related offense, and the force involved is often from struggling in an effort to get away" and there is "no weapon . . . involved in [second degree robbery]." H.B. REP. ON ENGROSSED SUBSTITUTE S.B. 5288, at 3, 66 Leg., Reg. Sess. (Wash. 2019).

with a deadly weapon enhancement" rather than "a second degree robbery" with a deadly weapon enhancement. There is no support in the statutory language for this empty exercise.

Moreover, unnecessary resentencings create hardships on victims and witnesses—a result that is also inconsistent with the legislative purpose behind the changes to statute. Because RCW 9.94A.647(1), properly construed, does not require resentencing where the trial court counted second degree robbery with a deadly weapon enhancement toward a persistent offender score, we disagree with Smith's argument and determine that he is not entitled to resentencing.

CONCLUSION

We reverse Smith's conviction for attempted first degree robbery but affirm the remainder of Smith's convictions and determine that he is not entitled to be resentenced. Accordingly, we remand for the trial court to vacate Smith's conviction for attempted first degree robbery.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

GLASGOW, C.J.

WORSWICK, J.